## STUDYBAKER et al., Appellants, v. COFIELD, et al.

### Division One, February 12, 1901.

1. **Undue Influence: FIDUCIARY RELATION: PRESUMPTION: DEED.** The grantor had never been married, was 84 years old, had for twenty-five years lived apart from his relatives, who resided in another State. The grantee, his niece, with her husband, had visited him about a year previously, and he was pleased and comforted thereby. During his last sickness, eight days before he made the deed, they were telegraphed for at their Ohio home, and immediately responded, and she was the only blood relative of the sick man in attendance upon him, or who had visited him in years. She nursed him, spoke kindly to him, encouraged him by saying that when he got well she was going to take him home with her, where he could see

his old friends and relatives, and at one time in the presence of others advised him to turn his attention to his spiritual welfare. She was not his exclusive nurse or attendant. By his deed made four days before his death, he cut out a sister and seventeen nieces and nephews and deeded all his land to this one niece, in consideration for love and affection and her covenant to support her own mother during her life, a lifetime use of the property being reserved to the grantor. *Held*, that there was no fiduciary relation existing between him and this niece, and hence the burden of proof was not upon her to snow that the deed was not the result of undue influence.

2. ———: KINDNESS: SELFISH MOTIVES. Even though services to an old and feeble relative in his last sickness were rendered with the hope of inducing favorable testamentary action, yet if they went no further than ministering to his comfort and consoling his mind, they do not amount to what the law condemns as undue influence.

Appeal from Pettis Circuit Court.—*Hon. George F. Longan,* Judge.

AFFIRMED.

*Sangree & Lamm* for appellants.

(1) The ancient ear-marks and recognized *indicia* of undue influence, moral coercion, fraud actual or constructive, surprise, imposition, over-solicitation, artfulness, are present in this record and show a transaction which equity will watch with an eye of "invincible jealousy" and annul.   (a) There is that superintendence of the mind, body and property of Joseph Boyer by the Cofields, creating an intimate and confidential relation which throws upon them the burden of sustaining the deed in question, and makes it presumptively void. (b) There is an aged man beyond four score, childish, of wandering and unsound mind, clouded by the shadows of impending dissolution, racked with disease and on his death bed, who strips himself by an irrevocable grant of practically all of a

considerable estate, by a deed drawn in advance with suspicious care by the Cofields' lawyer and dictated wholly by them, signed privately without the intervention of independent legal advice, or advice of other disinterested persons, and under circumstances indicating haste and design, a "catching" bargain. (c) There are the hopes and fears of the dying man played upon, deception as to his favorite nephew's (Edgar's) death, the sudden revulsion of Joseph Boyer's settled intentions about the disposition of his property, the failure to notify the other relatives by the Cofields, the grossly inadequate and simulated considerations elaborately expressed in the deed, which, with his impaired mind and physical feebleness, raise a "vehement presumption" of a species of fraud and undue influence.    (d) And there is the strong anxiety of the Cofields about the property and the disposition of it, the doubt and solicitude as to Mr. Boyer's mental capacity in the minds of those participating in the secret, ex parte and inadequate investigation at the time of signing the deed, which cast suspicion upon the deed and the conduct of the Cofields, and show the deed was not the spontaneous act of Joseph Boyer, but was pressed upon him and was the product of the Cofields' suggestions and management.    Many of the foregoing facts separately (and, *a fortiori,* all combined) show that the court below erred, and bring our contention within the following authorities.    Turner v. Turner, 44 Mo. 535; Cadwallader v. West, 48 Mo. 483; Garvin v. Williams, 44 Mo. 465; Yosti v. Laughran, 49 Mo. 594; Street v. Goss, 62 Mo. 226; McClure v. Lewis, 72 Mo. 314; Holliway v. Holliway, 77 Mo. 392; Bogie v. Noland, 96 Mo. 85; Rankin v. Patton, 65 Mo. 378; Martin v. Baker, 135 Mo. 495; Dingman v. Romine, 141 Mo. 466; Thompson v. Ish, 99 Mo. 160; Gay v. Gilliam, 92 Mo. 250; Hall v. Knappenberger, 97 Mo. 509; Hamilton v. Armstrong, 120 Mo. 597; Harding v. Handy, 11 Wheaton, 125.    (2) There is a distinc-

tion in the cases between a deed and a will and it requires greater mental capacity to sustain an irrevocable grant by deed (a bargain between two—a weak mind and a strong one) than it does to sustain a will (a one-sided instrument and revocable). Jackson v. Hardin, 83 Mo. 175'; Brinkman v. Rueggesick, 71 Mo. 553; Von De Veld v. Judy, 143 Mo. 348. (3) If, in this court, Elmira Cofield claims to hold the land as a gift, this she may not do in the face of the allegations in her answer and in the face of the deed setting forth the consideration for the conveyance. Cadwallader v. West, 48 Mo. 483; Hall v. Knappenberger, 97 Mo. 509.

*Barnett & Barnett* for respondents.

(1) In this case the evidence was all oral and the trial court saw the witnesses, and observed their manner and demeanor on the stand. The evidence was contradictory. The court could not accept the evidence of all the witnesses as true. Some of the testimony on the part of plaintiff was absolutely irreconcilable with the testimony of defendant's witnesses. The trial court possessed superior advantages in weighing the evidence and passing on the credibility of the witnesses. And in determining questions of fact and the credibility of the witnesses in such a case, the Supreme Court will defer much to the findings of the lower court and not reverse the case unless satisfied that such findings are against the preponderance of the evidence. Mathias v. O'Neill, 94 Mo. 530; Short v. Taylor, 137 Mo. 525; Bushong v. Taylor, 82 Mo. 666; Erskine v. Lowenstein, 82 Mo. 309; Chapman v. McIlwrath, 77 Mo. 43; Chouteau v. Allen, 70 Mo. 366; Springer v. Kleinsorge, 83 Mo. 159; Snell v. Harrison, 83 Mo. 658; Johnson v. Duer, 115 Mo. 336; Hendricks v. Woods, 79 Mo. 599; Bank v. Murray, 88 Mo. 196; Parker v. Roberts, 116 Mo. 667. This is

especially true where there is a material conflict of evidence. Springer v. Kleinsorge, 83 Mo. 159; Chouteau v. Allen, 70 Mo. 306; Mathias v. O'Neill, 94 Mo. 530; Erskine v. Lowenstein, 82 Mo. 309; Hendricks v. Woods, 79 Mo. 599; Parker v. Roberts, 116 Mo. 667.     (2) Joseph Boyer was capable of making the deed in question, as he understood the nature and effect of the transaction.     The mere fact that his mind may have been impaired by age or disease did not render him incompetent to make the conveyance.     Cutler v. Zollinger, 117 Mo. 92; Pennington v. Stanton, 125 Mo. 658; McKissock v. Groom, 148 Mo. 459; Fulbright v. Perry Co., 145 Mo. 432; Cutts v. Young, 147 Mo. 687; Dickson v. Kempinsky, 96 Mo. 252; Keithley v. Keithley, 85 Mo. 217.     The fact that deceased had at times delusions or hallucinations did not render him incapable of contracting, unless such delusions related to the subject-matter, and existed at the very time of the execution of the contract.     Cutler v. Zollinger, 117 Mo. 102.     (3) The burden is on plaintiffs on the issue of undue influence, and there is not a particle of evidence to sustain the allegation that defendants used over-persuasion or undue influence to obtain the execution of the deed in question.     McKissock v. Groom, 148 Mo. 459; Aylward v. Briggs, 145 Mo. 605; Riley v. Sherwood, 144 Mo. 354; Keithley v. Keithley, 85 Mo. 217; Scott v. Scott, 95 Mo. 300.     The deed was always in possession of defendants, and was produced in court by them.

VALLIANT, J.—This is a suit in equity by the collateral heirs of Joseph Boyer, deceased, to set aside a deed made by him a few days before his death to his niece, the defendant Elmira Cofield, on the ground that he was of unsound mind when he made the deed, and was induced to make it through her undue influence.

The deceased was eighty-five years old, had never mar-

ried, and at his death left as his heirs two sisters, Catherine Tarman, one of the plaintiffs, and Susan Black, one of the defendants, and seventeen neices and nephews, children of deceased brothers and sisters, all of whom are plaintiffs except the defendant Elmira Cofield; the sister Susan Black, who was one of the defendants, was the mother of Elmira, and has died since this suit was begun. The deed assaulted conveys a farm of about 200 acres in Pettis county, which was the bulk of his property, to defendant Elmira. His estate was solvent, although the personalty amounted to only a few hundred dollars. He died intestate. The deed reserves in the grantor the use, possession, rents, and profits of the land for life. The consideration expressed is ten dollars cash, love and affection, and the obligation of the grantee to maintain and support her mother, the grantor's sister, Susan Black, during her life. The petition charges that the deed was made (or essayed to be made) "when his mind had become so impaired by the accumulated ravages of age and disease that he was not capable of contracting or of intelligently transacting business;" that it was "procured and brought about by the selfish and wrongful entreaties, solicitations, machinations" of Elmira and her husband, who "were at the time the only relatives and confidential advisers of said Joseph Boyer in attendance on him and nursing him, and they wrongfully contrived by their position as relatives and nurses, and confidential advisers and their arts and blandishments, to obtain and assert an unfair and selfish domination and undue influence over his feeble will-power, to the detriment of the absent heirs and to the gain of said Elmira and her mother Susan Black, and by such unfair and selfish domination and undue influence and by said solicitations, entreaties and blandishments and consulting and advising him thereto, thus procured the deed; that it was not the act and deed of Joseph Boyer, but that of Elmira and her husband,

obtained through those influences and by prejudicing him against his other relatives, the plaintiffs herein, who resided in distant States." There were no specifications in the petition demonstrative of those charges, but they were denied by the answer.

The evidence showed that Joseph Boyer was an old bachelor who for the last twenty-five years or more of his life had lived in Pettis county without the society of any of his relatives, who lived in other States, Ohio, Illinois and Iowa. There was nothing very peculiar about his habits or character to distinguish him from an ordinary recluse of that kind. He was a man of usual intelligence, attended to his own business and grew old with habits formed and hardened under the somewhat arid conditions that ordinarily environ the life of an old bachelor.

One of plaintiff's witnesses, Davidson, who was a hired man on the farm, in conversation with Boyer, casually said that he had come from Tama county, Iowa, whereupon the old man said that he had relatives living in that county and named Edgar Boyer his nephew, whom he said he wanted to come and take charge of his place when Jones's lease was out, and that after he himself was done with it, he intended to give it to Edgar. Mr. Jones, the tenant on the place with whom the old man lived and who was the plaintiff's chief witness, testified that sometime before he was taken sick of his last illness the old man spoke to him about his relatives and his property and said that there were a good many people who wanted his property, but he was not going to give it to any one, but if he ever did deed it to anyone, his nephew Edgar, who lived in Iowa, should have the biggest part of it; that if any old person deeded away what he had he was liable to get kicked out of the back door and go to the poor house, that he was sorry he could not take his property along with him when he died, but as he could

not do that he would just leave the law to settle it, that he had not received a letter from any of his relatives for seven years except Cofield.

Mrs. Cofield and her husband lived in Ohio; the year before her uncle's death they had come on an excursion to Kansas City and had stopped off at Sedalia and gone out to the farm and paid the old man a visit of a day or a day and night. That was a pleasant visit; he was glad to see them; they talked of old times and old acquaintances. This is the only visit that the evidence shows any of his relatives ever paid him. When he was taken sick in his last illness and grew so ill that the Jones family who were attending him became apprehensive that he was going to die, Mr. Jones suggested to him to telegraph for the Cofields, but he objected, saying that he thought he would get better and that Cofield was a busy man and it would trouble him to leave his business. But the next day he was no better and Jones again said that some of his relatives ought to be sent for, and Boyer said he did not know the address of any of them except the Cofields and finally requested that they be telegraphed to come. Jones accordingly telegraphed them on Sunday and they arrived on Monday. The meeting between the old man and his niece was affectionate, he wept and said, "Mira, I am glad to see you.". She immediately began to minister to his comfort, and continued to do so until his death, which occurred twelve days thereafter and four days after the deed was made.

The testimony on the part of the plaintiffs was to the effect that on the day of her arrival she asked him about the condition of his property, if he owed anything on it, etc., and being assured, that it was clear of debt, she told him that he would not get well and that he should prepare to die, or as the plaintiffs' witnesses expressed it, "give up all thought of business and lay it all on the altar." There was some testimony about

a note of $1,000 which he held and which, when the tax assessor some months before wanted to assess, he tore into pieces and threw away, but a member of the Jones family collected the pieces and put them together. This incident was mentioned in the conversation in which Mrs. Cofield asked about the condition of his business, and she advised him to give her husband a power of attorney to attend to that, and he agreed to do so.

In this same conversation he told her that he had about four hundred dollars in bank (which was the fact) and she said she thought he ought to have more money than that. In a subsequent conversation, on another day, plaintiffs' witness Jones "heard her tell Mr. Boyer if he got well she was going to take him home with her, take him and keep him until fall, go and see all of his folks, and all of his friends back there. Talked on considerable, I can't remember what all. Q. Anything more about property matters? A. No; I don't believe there was at that time."

After plaintiffs had closed their case and the defendants were introducing their evidence, the plaintiffs by leave were allowed to recall two of their chief witnesses, Jones and his daughter, who testified that on the morning of the arrival of the Cofields the old man asked Elmira where Edgar was and that she said he was dead and that that was all that was said on that subject.

Plaintiffs' witness Jones testified that on the first day of the arrival of the Cofields, Mrs. Cofield sent her husband to town to buy bed clothes and bedding for the old man as those he was using were in a very unsanitary condition; witness testified that he accompanied Cofield on that trip and that Cofield on that day consulted the lawyer who afterwards wrote the deed, as to which was better under the circumstances, a deed or a will, and that the lawyer advised a deed. On that point this witness was contradicted by the lawyer who testified

that Cofield came to see him first on the day next before the deed was executed, asked him to write the deed, and said nothing about a will.

That is substantially all that the evidence tended to prove to support the charge of undue influence. In support of the charge of mental incapacity the plaintiffs called in chief four witnesses, Davidson, a farm hand in the employ of Jones, Jones the farmer who was the lessee of the farm and in whose family Joseph Boyer was living at the time, and Jones's wife and daughter, and in rebuttal plaintiffs called three physicians who had not seen Boyer, but who gave testimony as experts in answer to a hypothetical question. Davidson's testimony was to the effect that he was occasionally employed as a hand on the Boyer farm, was there as such about three weeks before his death, saw him several times and talked with him: "I thought lots of times the old man was kinder out of his mind." When asked why he thought so he said that the old man would lie in bed at night when he could not sleep and would sing or hum, and one time late at night he got up and went out and brought in fence posts and put the ends in the fire and charred them, and sometimes he charred them too much, burnt several of them too bad to use. He was asked, "Are posts sometimes charred for the purpose of putting them in the ground?  A. I suppose they are, yes, sir.  Did you think there was anything remarkable to char them in the fire place there?  A. Yes, sir; I think so; to leave the ends of them to stick out and fill the house full of smoke, I thought it looked curious."  On cross-examination: "Q. Isn't it true that you simply thought he was nervous and childish and that was all you thought was the trouble?  A.  I don't know what was the matter with him. Q. He could talk reasonable and sensible about any business matter?  A. Seemed to."

Mr. Jones, in whose family Boyer had lived the last three

years of his life and who was the plaintiffs' chief witness, and not a reluctant one, gave testimony both as to his physical and mental condition. This witness testified that some six months before his death, Mr. Boyer had a dizzy or fainting attack and would have fallen into the fire but for the presence and timely interposition of witness's wife and daughter; he was laid on his bed, and witness could see no life in him; in a short while he came to his consciousness and said, "I. am pretty near gone." It seemed to witness as if his tongue was stiff. That was several months before his last sickness. This witness also narrated incidents of charring the ends of the fence posts, and of singing or humming to himself at night, in relation to which the former witness had testified. He testified that the old man was finally taken with a derangement of the bowels, thought to have been caused by a dose of coal oil and dose of blue mass which he administered to himself. In this sickness he occasionally had fever and was at times delirious. One night when in this condition he saw his coat hanging in the room, and asked witness to take it down; he said it was something black that was going to catch him, and when the coat was taken down he said, "Now it is gone." That was before the Cofields came. After they came the witness sometimes heard him call Mrs. Cofield, "Retta," mistaking her for a neighbor, Mrs. Retta Hill. Cross-examined on this point, he said:

"Q. You say he didn't know Mrs. Cofield? A. At times.

"Q. How often? A. I heard him at different times call Mrs. Cofield, 'Retta.'

"Q. Did he know Mrs. Cofield when she came, then? A. Yes, sir.

"Q. Did he know her except at certain times when he was delirious? A. I suppose so—or be out of his head.

"Q. But at other times he knew her? A. Yes, sir."

Witness also related that within five or six months before his death he saw the old man seize a raw biscuit and jab it in his mouth, smearing it over his mouth and whiskers, and upon another occasion doing likewise with a handful of flour. Witness's attention was drawn to the date of the deed and asked if before that, during that sickness, he noticed anything peculiar in the old man's appearance, to which he answered, "Yes, sir; his eyes looked faint, looked coldish for several days. Q. Anything about his appearance. A. Yes, sir; he couldn't talk. He tried to talk to me once about getting him some medicine, and I couldn't understand what he said. He motioned towards the medicine."

Witness also testified that on the day the deed was made, before the doctor and the lawyer arrived, the old man's bowels moved while he was in bed and he was unconscious of the fact, causing an intensely offensive smell, and that to deodorize the room Mrs. Cofield took leaf tobacco and burned it; that Boyer did not use tobacco, and that the smell of burning tobacco to one unaccustomed to its use was liable to make him dizzy; witness told Mrs. Cofield she ought not to do that, that it would kill Boyer and it did seem to strangle him; and then witness opened the windows and let the smoke out; the doctor and lawyer came about a half or three quarters of an hour after that, the deed was executed while they were there, witness was not in the room when it was executed, having been invited out by Cofield. Was informed that afternoon by Mrs. Cofield that her uncle had made a deed to her. Witness's daughter asked her if she believed he knew what he was doing and she said: "No; if he had he would never have done it."

Witness was of the opinion that on the day the deed was executed and the day before, Boyer could not understand what he was doing; witness would ask him if he wanted his medicine and he would answer, "Uh, uh."

"Q.  You think he was unable to make himself understood at all?  A.  That is according to my—

"Q.  And was unable to understand what people said to him?  That is the way I took it.

"Q.  You don't think he would have been able to have recognized them?  A.  He might have recognized them, but still he could not talk, he couldn't talk, his tongue was thick, but how long he would stay in that condition I don't know."

At the conclusion of his testimony this witness was asked:

"Q.  In your judgment, from what you saw of Mr. Boyer there for the last week or ten days before he died, state to the court whether he was of mind sufficient to understand what he was about in business matters?  A.  No, sir.  When he was up and around it was only at times he had a mind fit for business.  As Elmira told him, he ought to have a guardian appointed."

The witness had previously stated that the old man had told him that when Mrs. Cofield was there to visit him the year before, she had told him that he ought to have a guardian appointed and that he had told her she needed a guardian worse than he did, then she left the room "kinder mad."

The foregoing is the substance of Mr. Jones's testimony and on the main features he was corroborated by his wife and daughter, who testified to the same incidents and were of about the same opinion as to the old man's mental condition.

A hypothetical question embodying what the witness for plaintiff on that subject had testified to was propounded to three eminent physicians of Sedalia to which the following answers were given:

Dr. Overstreet:  "I would not think that his mental condition was such that he would be able to transact business."

Dr. Evans:  "I do not think his mental condition was good."

Dr. Seales: "And these conditions existing as described there, I would think it was doubtful about his sanity."

On the part of defendants, Henry A. Hill, a neighbor who had lived near Mr. Boyer for twenty-six years, testified that he called to see him, on Wednesday before his death, which was the day after the deed was made.

"Q.  How long were you there?  A.  I think I was in the room perhaps a half hour.

"Q.  What were you talking about?  A.  We were talking about his sickness.  I went and spoke to the old gentleman and asked him how he was and he inquired about my family and children.  I had lived with him previously.

"Q.  How was his utterance, could he talk?  A.  I didn't see anything wrong.

"Q.  Did you notice anything wrong with his mind?  A. Not a thing.

"Q.  How did he appear as to his mental condition?  A. He seemed just as clear in his mind as he ever did; talked just as rational as ever."

Dr. Gresham was the physician in attendance.  He began attending him on March 14 and continued until March 22, and on the day the deed was executed, which was March 19, had been requested by Mr. Cofield to let Mr. Fast, the attorney who drew the deed, ride out to Mr. Boyer's with him, and he did so. This is from his testimony:

"Q. . From the time you commenced attending him up to the date of this deed, just describe to the court his condition, physically and mentally?  A.  His physical condition was, he had been sick, he told me, for something over a month when I had been to see him the first time, and he was naturally in a debilitated condition and was feeble.  He was up the first time I was to see him, still he was weak from his sickness and his age together.

Vol 159 mo—39

"Q.    What was his mental condition? A. I took it to be all right, that is, as near all right as you could expect a person of his age; he was about eighty-four I think.

"Q.    He was weak and was an old man? A. Yes, sir.

"Q.    Did he converse rationally? A. Yes, sir.

"Q.    Did you observe anything wrong with his mental condition? A. No, sir; I did not.

"Q.    Were you there the day the deed was made? A. Yes, sir.

"Q.    Explain to the court his condition on that date? A. He was gradually growing weaker. At first he seemed to be improving.

"Q.    What do you mean by first? A. The first few days I attended him his physical condition seemed to be better and I think he was slightly improving at the time the deed was made, but I would not be positive about that; his fever was not as high, though. As well as I remember his fever was not as high that day as it had been."

Speaking of the execution of the deed he said:

"Q.    State whether he seemed capable of comprehending and understanding what he was doing. A. Yes, sir.

"Q.    And wanted to do it? A. Yes, sir. I talked right along with him and he seemed to understand everything that was going on and he told me about it.

"Q.    Was there any trouble about his utterances? A. I didn't notice it if there was.

"Q.    Could he talk so you could understand him? A. Yes, sir.

"Q.    And he could understand you? A. Yes, sir.

"Q.    From what you saw there as a physician, state what your opinion is as to whether he was of sound mind, and capable of understanding the nature of the business he was transacting? A. Yes, sir; I believe his mind was all right; that is as

much as you could expect of a person of his age. Of course any person of his age is more or less childish, but as far as his mental condition, I think he was all right.

"Q. You think he understood clearly what he was doing, and what he desired to do? A. Yes, sir.

"Q. Was Mr. Cofield there? A. Yes, sir.

"Q. State whether any persuasion was used to induce him to sign the deed.

"By Mr. Lamm: State what was said.

"Q. By the court: Yes, sir.

"By Mr. Barnett: Did Mr. Cofield state anything? A. I did not hear."

The witness saw his patient the next day and his condition was about the same, though weaker.

The testimony of Mr. Fast, the lawyer who wrote the deed, was to the effect that the day before the deed was executed Mr. Cofield came to his office in Sedalia and requested him to prepare the deed and he did so, conforming it to the terms and conditions dictated by Mr. Cofield, and on the next day at like request he went out with Dr. Gresham, and saw to the execution and took the acknowledgment. This witness had never seen Mr. Boyer before; he went into his room, was introduced to him by the doctor, who said, "You understand what Mr. Fast has come out here for," and Mr. Boyer said, "Yes." Then witness began conversing with him, asked how he was, and after talking awhile about his sickness, witness introduced the subject of the deed, explained the contents of it fully, the old man asked him several questions about it, and seemed to comprehend its terms, then witness read it over to him, and he said at the conclusion: "Yes, that is all right." Witness asked him if he could write his name; he replied that he could not write very well at any time, and did not think he could write that day. He was then propped up in bed with

pillows, and with the assistance of witness made his mark to the deed, and the same was witnessed by this witness, Dr. Gresham and Mr. Cofield, witness taking the acknowledgment as notary. Those three were the only persons in the room. He was asked his opinion as to the old man's mental condition, and answered: "I am clearly of the opinion that it was entirely sound."

There are 150 printed pages of evidence, but the above is a substantial epitome of it. The chancellor found the issues for the defendants and rendered a decree accordingly, from which the plaintiffs have appealed.

I.    Upon whom is the burden of proof? Plaintiffs insist that a fiduciary relation existed between Mrs. Cofield and her uncle, and the deed having been executed while that relation existed, the presumption arises that it was the result of undue influence, and the burden is upon her to show that such was not the case. In support of the proposition that such presumption arises when such relation exists, and that the burden of proof shifts to the defendant when the plaintiffs' proof establishes that relation, a large number of cases are cited from our reports, and the proposition is fully sustained. [Garvin v. Williams, 44 Mo. 465; Cadwallader v. West, 48 Mo. 483; McClure v. Lewis, 72 Mo. 314; Martin v. Baker, 135 Mo. 495; Dingman v. Romine, 141 Mo. 466.]

But did such a fiduciary relation exist? The law is as cautious in defining a fiduciary relation in the sense in which we are now using that term as it is in limiting by definition the boundaries within which fraud may be pursued. There are certain technical relations that are readily comprehended as fiduciary, such as guardian and ward, attorney and client, priest and communicant, etc., but there are other relations not falling in either of those specified classes that are in fact fiduciary, and, conversely, it is not every guardian, attorney

or priest, *quia eo nomine,* who is to be adjudged to hold a fiduciary relation with the party in regard to a particular subject. It is in each case a question of fact. The law regards the real rather than the nominal condition. The principle is thus stated in 27 Am. and Eng. Ency. of Law, 460: "The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations that exist whenever one trusts in and relies upon another. The only question is, does such a relation in fact exist?" While the relation of nurse and patient may raise the question, yet it does not in itself answer that question, but the inquiry is still one of fact. Was trust reposed? That Mrs. Cofield was the only blood relation of the sick man in attendance upon him, that she nursed him, spoke kindly to him, encouraged him by saying that when he got well she was going to take him home with her, when he could see all his old acquaintances, etc., and that at one time in the presence of several persons she advised him to turn his attention to his spiritual welfare, are the only facts, if any, in the record going to sustain the allegation of fiduciary relation, and they are the sole foundation for the charges of "blandishments" and "ghostly ministrations." But the evidence does not show that she was his exclusive nurse or attendant after she arrived. On the contrary Mr. Jones's daughter testified as follows: "Q. State to the court whether you had access to him and could see and observe him from day to day? A. I gave him his medicine all the time and attended to him all the time as much as I possibly could. Q. How was he about swallowing medicine? A. He took it very good as long as I gave it to him. He called me and told me he wanted me to give him his medicine." And Jones himself testified that he gave him medicine and attended to him. Jones also took sufficient control of the sick room to remonstrate against the burning of

tobacco, and opened the windows to let the smoke out. He also testified that in the presence of Mrs. Cofield he asked Mr. Boyer if he was going to deed away his farm, and Mr. Boyer said no; this he said he asked because he had broken his ground for corn and wheat, and he was anxious about what he would have to do. Thus we see there was no exclusive control, no secrecy, no confidence, and scarcely a pretext on which to predicate the idea of a fiduciary relation and abuse of confidence. The burden of proof, therefore, was upon the plaintiffs.

II.    Whilst the law watches with a jealous eye the conduct of a person in the situation of Mrs. Cofield in this record, yet its sense of justice is never lost in mere artificial rules. The law is as much the perfection of reason and common sense on this, as it is on any other subject. It lays down no such cast-iron rule as would deter a kinsman, who might have expectations of a testamentary benefit from ministering to the wants of his sick and dying relative or soothing his last days with kind attentions. Even though we might suspect that the services rendered and the attentions bestowed were with the hope of inducing favorable testamentary action, yet if they went no farther than ministering to the comfort and consoling the mind of the sick relative they would not be brought under the condemnation of the law. [Riley v. Sherwood, 144 Mo. 354; Aylward v. Briggs, 145 Mo. 604; McKissock v. Groom, 148 Mo. 459.]

The charges in this petition of "entreaties," "solicitations," "machinations," "arts and blandishments," and "prejudicing him against his other relatives" are not supported by the evidence and the chancellor was justified in finding for the defendants on that issue.

III.    On the proposition that Joseph Boyer had not sufficient mental capacity to make a deed, the plaintiffs' evidence was weak and was entirely overcome by the testimony of

the defendants.  The incidents mentioned by the plaintiffs' lay witnesses were trivial and did not justify the conclusion that the old man was more whimsical or childish than men of his age ordinarily are.  The hypothetical question propounded to the learned witnesses brought answers that indicated that there might, in the opinion of the experts, be doubt as to the sanity of the man hypothetically described.  But in the face of the clear and intelligent testimony of the physician who attended him, and of the lawyer who was present when the deed was made and of the neighbor, Hill, who called to see him the next day, when, as his physician testified, he was weaker than on the day the deed was made, that doubt was entirely removed.

IV.  It is argued that the old man was defrauded into the belief that his favorite nephew Edgar Boyer was dead. The plaintiffs have the advantage of position on that point. No one living besides the Joneses were present when Mrs. Cofield is said to have made that misrepresentation, and as she is not a competent witness the evidence could not be contradicted, even if it was untrue.  But the learned chancellor, who had a better opportunity of weighing the oral evidence than we have, seems to have concluded that the Joneses were probably mistaken on that point.  The evidence, however, was irrelevant, because there was no issue of that kind tendered in the petition.  The record before us shows that plaintiffs' case has been presented in the pleadings, evidence and argument, both in the trial court and here, with great ability, learning and industry. The fact that the point was not made in the petition nor alluded to in the plaintiffs' evidence in chief, but was only brought in out of order by interruption of defendant's testimony, indicates very strongly that it was an afterthought of the plaintiffs, and that their counsel had never heard of it. Whether the chancellor either discredited the testimony or disregarded it as irrelevant, there is no ground to complain of his

conclusion.   Besides, there is little on which to base an argument that Edgar was a favorite nephew or a very deserving one.   Whether his uncle had ever seen him, we do not know, but we do know that he had not heard from him for more than seven years.   True, the testimony tends to show that he said that after Jones left the farm he wanted to bring Edgar there, and give it to him after he himself was done with it.   Again, he said that he would never deed the place to any one, but if he should do so Edgar should have the biggest share.   But his last statement was that he would like to carry it with him when he died, but as he could not do that he would make no disposition of it, but leave the law to settle it.   Thus we see that he had no decided favorite, and was in such a condition of indifference in regard to his relatives that his choice was liable to fall on any one of them.

He was under no obligation to any one of them and we do not know that he knew even the names of any of his seventeen nieces and nephews, the plaintiffs in this case, except that of Edgar.   Under these circumstances it is not strange or unnatural that he concluded to give the farm to the only one of his relatives who had ever visited him or who had written to him in more than seven years, or who had ever held even a glass of water to his fevered lips.

V.   The point is made in the brief of appellants' that there is no evidence that the deed was ever delivered.   But there is no such issue tendered in the petition; the instrument is treated as a deed duly executed, so far as the formal requisites of the law are concerned, and it is attacked in equity on the ground of fraud.

It is also insisted that the considerations expressed on its face are fictitious.   The money consideration named was merely nominal; the real consideration was love and affection, which was alone sufficient to sustain the deed.   It is manifest

from the whole transaction that it was a deed of gift and not the result of a bargain and sale. The argument is made that the agreement of Mrs. Cofield to support and maintain her own mother, the grantor's sister, was a mere device to give the deed the aspect of resting on a substantial valuable consideration. The deed would doubtless have expressed the real fact if it had rested on the recital of love and affection as the sole consideration. But it is not at all improbable that the grantor wanted to give his sister Mrs. Black, who the evidence shows was in poor circumstances, an interest in the property, and instead of giving her such interest in direct form, he made Mrs. Cofield's obligation to care for her during her life a part of the consideration under which she would take the property. The deed is not vulnerable on that ground.

VI. Plaintiffs complain that they were cut off in their cross-examination of Dr. Gresham. But the court's interruption did not occur until all the questions asked had been answered and the counsel gave no intimation to the court of any other question they desired to propound.

The learned chancellor rightly viewed the law and the facts of this case, and his judgment is affirmed. All concur.