PECKHAM et al. v. JOHNSON.

No. 13429.

Court of Civil Appeals of Texas.
Fort Worth.

Oct. 16, 1936.

Rehearing Denied Nov. 20, 1936.

Bonner, King & Dawson, of Wichita Falls, for appellants.

Kilgore & Rogers, of Wichita Falls, for appellee.

SPEER, Justice.

This suit was originally filed by W. H. Peckham against F. T. Johnson for an accounting of the business of an alleged copartnership between the two while engaged in the ownership and operation of some named oil leases upon which there was small production. The plaintiff claimed that the defendant was indebted to him for overpayments of firm debts which the defendant should have paid but that, to protect his own interest in the property, plaintiff had paid them, and asked for a foreclosure of an equitable lien on the interest of defendant in the partnership property.

The suit remained on file a year or more, during which time certain adjustments were made between the parties, making it unnecessary for a trial of the issues raised.

In August, 1935, plaintiff, joined by two corporations which had acquired an interest in the oil leases, and about whose interest there is no controversy, amended the original petition so as to convert the cause into one of trespass to try title against the defendant Johnson. The amended allegations were sufficient for that purpose.

Defendant F. T. Johnson answered with a general denial, the plea of not guilty, and by special cross action against Peckham as cross-defendant, and for convenience in making a statement of the nature of the suit, we shall refer to the parties by their respective names as Peckham and Johnson, there being no necessity to further refer to either of the corporation plaintiffs.

By his cross-action, Johnson pleaded that in July, 1933, he and Peckham associated themselves together as equal partners in a joint enterprise of owning, developing, and operating certain oil leases and that the copartnership continued to exist until June 23, 1935. That pursuant to their agreement they did drill two wells on the properties, struck oil, and operated the wells, each contributing his respective share to the expenses incurred, and each were entitled thereby to participate equally in the profits derived from the venture; that by the terms of their contract and agreement, prior to June 23, 1935, Peckham was to supervise the entire operation, do the bookkeeping, pay the bills from funds received, and to account to Johnson for his share of the net profits. That in the early life of their contract they jointly operated the leases and each was familiar with conditions as they existed. That later, about seven months prior to June 23, 1935, conditions arose from which the parties deemed it wise that only one of them should devote his time to the venture, and it was agreed that Peckham should so handle it, and Johnson went to work in another county, where he had no means of knowing of the existing conditions in the area of the joint properties, and thereafter knew nothing of the operations and oil developments in that vicinity; that Peckham had other property in that locality, and employees, who aided him in operation of the joint property, kept him posted as to interest and development in that area; that Peckham knew when he purchased the interest of Johnson that the property in the immediate vicinity of that owned by the parties had materially enhanced in value, from wells being drilled and prospects for oil development close to that of the partnership, from inquiries had by him from prospective purchasers, and with full knowledge that Johnson did not know of said facts and that Johnson was relying upon him to look out for the interests of the copartnership and to keep him apprised of all facts of interest and benefit to both, and with the intention of acquiring the interest of Johnson in said leases for less than its value, he approached Johnson on Sunday, June 23, 1935, and told him that the gas supply, from which power was obtained to pump the wells, had diminished until it was no longer adequate, and that because thereof it would be necessary to incur additional expense in the matter of operation, and that the enterprise had been operating at a loss and that there was no hope of realizing anything thereon, and that he (Peckham) owned some other acreage in that vicinity which had little value, and if he could acquire Johnson's interest in these leases Peckham could group them with some of his worthless leases and perhaps make a sale.

It was further alleged that on said June 23, 1935, in an effort to buy Johnson's interest in the two leases, Peckham offered him $1,000, which was rejected, and then offered $1,500, which was accepted, and that they then and there wrote a letter from Johnson to Peckham confirming the agreement. That at that time, Peckham had on the preceding day entered into a written agreement with a solvent corporation to sell it the smaller of the leases, known as the Trew lease, for $3,-000, and that the remaining lease, known as the Alice Johnson lease of 100 acres, was as valuable per acre as the Trew.

It was further alleged that Peckham then and there knew that numerous other persons and corporations interested in buying oil leases had approached him with a view to buying the leases; that twenty or more spudders were then operating in the vicinity of the leases in controversy, prospecting for oil and gas, all of which tended to make other leases· salable, and that although the fiduciary relation of partners existed between them, with the knowledge Johnson did not know and had had no means of knowing such conditions existed in that area and that Johnson was relying upon the representations of his partner that the leases had little or no value, Peckham failed to disclose the facts in his possession, thereby deceiving him and inducing him to sell his interest at much less than its true value. That in keeping with said agreement, Johnson did execute his written assignment to Peckham on July 8, 1935, and a purported correction assignment thereof on July 15, 1935, covering an undivided one-half interest therein.

Johnson further alleged that at the time the purchaser of the Trew lease contracted with Peckham for same, on June 22, 1935, its president indicated to Peckham that he was also interested in buying the Alice Johnson lease of 100 acres, and that after Peckham procured Johnson's interest he did, pursuant to previous negotiations, sell to that corporation· the remaining 100 acre lease at an agreed price of $75 per acre, and that because of the deception and· fraud perpetrated on him, the said Johnson, by Peckham, the latter was not entitled to receive and retain any of the profits arising from the sale of the one-half interest so purchased from Johnson. Johnson alleged that the property had passed into hands from which he could not repossess it and therefore could not compel a rescission of the assignment from him to Peckham, and elected to sue for his damages because of the alleged fraud perpetrated, and prayed for judgment for damages in the sum of $5,000.

Peckham filed a supplemental petition and answer to Johnson's cross-action, denying generally the allegations of fraud, and specially pleaded that from the beginning of the partnership in 1933 the parties were having differences in their business dealings, and that their relations as partners were not normal but strained and unsatisfactory to both; that when Johnson originally sold to ·Peckham a half interest in the leases, the seller agreed to drill two wells and equip one of them at his own expense, but that he had failed to comply with his contract and that the buyer had been forced to pay out more than $1,100 thereon to protect his own interests, and that he had sued Johnson for an accounting and that the suit was pending when the deal was made upon which the cross-action is based; that nearly a month after June 23, 1935, with full knowledge of all the facts alleged by Johnson as grounds for his action for fraud, he executed a correction deed of assignment without complaint and thereby ratified and confirmed his prior sale. That because of the strained relations between the parties, they did not enter into the contract of June 23, 1935, with the same confidential relations existing between them as that fixed by law, but that they dealt with each other as man to man and at arm's length, each relying upon his own judgment as to the existing facts.

The case was submitted to a jury on special issues, the substance of which, with their respective answers, were as follows:

(1) Prior to June 27, 1935, Peckham had been offered by Mudge Oil Company $50 per acre for the Trew lease.

(2) Prior to June 27, 1935, Peckham and Mudge Oil Company were negotiating for the sale of the Trew lease.

(3) Peckham did not make full and complete disclosures to Johnson of all material facts between him and Mudge Oil Company prior to June 27, 1935.

(4) The Mudge Oil Company had expressed to Peckham an interest in the purchase of the Alice Johnson lease prior to June 27, 1935.

(5) Peckham did not make full and complete disclosure to Johnson of all the material facts expressed by Mudge Oil

Company prior to June 27, 1935, in the purchase of the Alice Johnson lease.

(6) Prior to June 27, 1935, Ed Ruwalt had expressed a desire to Peckham to acquire both leases on some sort of a drilling contract.

(7) That prior to June 27, 1935, Peckham did not disclose to Johnson the expressed desire of Ruwalt to acquire both leases.

(8) Prior to June 27, 1935, Ward Preston had proposed to Peckham to acquire the leases on some sort of a drilling contract.

(8a) Peckham did not communicate to Johnson prior to June 27, 1935, that Ward Preston had expressed a desire to acquire the leases on a drilling contract.

(8b) Peckham priced the leases to Ward Preston at $100 per acre.

(9) Peckham did not disclose to Johnson prior to June 27, 1935, that he had priced the leases to Preston at $100 per acre.

(10) Peckham priced the Alice Johnson lease in February, 1935, to the attorney of one of the fee owners at $8,000.

(11) Prior to June 27, 1935, Peckham had not communicated to Johnson the offer made by him to the attorney of one of the fee owners of the land.

Before the submission of the issues to the jury, Peckham duly objected and excepted to the charge because of its omission of the issues he believed should be submitted and, among other requested issues, presented to the court and requested the submission of issues inquiring: (a) Were Peckham and Johnson dealing with each other at arm's length, that is, each endeavoring to obtain for himself the best deal that he could? (b) Did Johnson rely upon Peckham to make disclosures to him as to negotiations, if any, theretofore had by Peckham for the sale of the leases? (c) Would the information inquired about in the court's submitted issues have been material to Johnson in making the sale to Peckham, if he had known it? (d) Was such information as was disclosed to Johnson by Peckham as to the leases and their sale such as would have put a reasonably prudent man on inquiry and which information, if pursued diligently, would have apprised Johnson of all the facts? Further objections to the charge as a whole were to the effect that it nowhere submitted an issue that would enable the jury to determine, in any event, what amount, if any, was due Johnson as damages; and that all issues submitted on whether or not Johnson relied upon Peckham to disclose the information possessed by him erroneously placed the burden of proof on Peckham.

The court rendered judgment for Johnson against Peckham for $3,750, and quieted the title to the leaseholds in Mudge Oil Company.

Peckham duly excepted to the judgment and has appealed to this court on nineteen assignments of error. These assignments may be classed into four groups, namely: (1) Because the court rendered judgment for $3,750 against appellant without having submitted an issue to the jury for its determination of the amount of damages, if any, sustained by appellee. (2) Was the trade between the parties made on Tuesday before June 23, 1935? (3) Because the court did not submit any issue inquiring if appellee relied upon appellant to disclose to him all information in his possession concerning the value of the leases and in refusing appellant's requested issues on that point. (4) Because the court erroneously placed the burden of proof on appellant to show he had informed appellee of the material facts which tended to render the leases valuable.

The parties to this appeal entered into an agreement in 1933 with all the elements sufficient to create a mining co-partnership, each with an undivided one-half interest in the two ordinary seven-eighths mineral leases on two tracts of land, one of 40 acres known as the Trew, and the other 100 acres known as the Alice Johnson leases. By the terms of their agreement, appellee was to drill two wells on these leases and, if oil was found, to equip the second well with pumps and all necessary appliances to put oil in the tanks. This partnership continued until June 23 or 27, 1935, when appellee sold his interest to appellant and out of this sale grew this lawsuit.

It is a well-settled rule of law in this state that the relation existing between partners in a joint venture is one of mutual good faith, and that the success of the enterprise depends largely upon honesty and fair dealing with each other; it has been held that in one sense there is a fiduciary relation between them,

and especially when one of the partners is ignorant of the details of the business and the other is an expert and knows all the facts rendering the business profitable or a losing proposition; more especially when the latter is intrusted with the management of the business and his advice and counsel have been relied upon by those associated with him. Tex.Jur. vol. 32, pp. 296, 297, § 49; Butler v. Edwards et al. (Tex.Civ.App.) 50 S.W. 1045; Armstrong v. Simms et al. (Tex.Civ.App.) 132 S.W. 500, 501.

In the case of Armstrong v. Simms et al., supra, the court used this strong language: "The members of the partnership owe to each other the most scrupulous good faith. Each one has a right to know what the other knows, and their relationship is one based on the strictest confidence. This rule is applicable to all classes of partnership. * * * We have found no case that licenses one member of a nontrading firm to enter into conspiracies to defraud other members out of their interest in the partnership property, and appropriate it to his own benefit."

■ Other cases are cited by appellee from other jurisdictions which use even stronger language, all of which we believe to be fully justified under the facts of the cases examined. This rule undoubtedly is sound and should require no proof to establish that the partners were faithful and true to each other, but will be presumed as a matter of law, unless under proper pleading and by competent evidence it is made to appear that although certain persons were partners in a business enterprise their dealings with each other for a period of time sufficient to affect their rights had not been that of normal partners, but that their relations were strained, showing evidences of mistrust and known lack of fair dealings. If the confidential relation fixed by law between the parties be shown by evidence to have been shattered, then neither party can rely upon the relation and duties of his copartner imputed by law, and close his eyes to the fact that he had ceased to repose that confidence in his associate in business the law presumes to exist. Under such conditions, the right of one partner to rely implicitly upon the words and acts of another becomes an issue of fact for determination by the court or jury trying the disputed point. To illustrate, we know, as a matter of law and right, the marital relations between husband and wife are sacred, confidential, binding on each to disclose to the other everything of value to both or either, and each have a right in law to assume that the other has so dealt with him or her; but when this heaven-born affinity has been rent in twain and they live as husband and wife in name only, with no tie between them other than a legalized ceremony which originally united them in wedlock, and lacks only a decree of court to undo that ceremony and make two of them instead of one, they cannot close their eyes to the conditions as they exist and expect the law to impute to the other a duty of perfect faith and confidence.

■ We have not found a case by the courts of this state where this precise question has heretofore been decided, but to us the principle seems right. Appellant cites, as bearing on the point, 26 C.J. p. 1158, § 72, which we consider worth quoting here: "But where the claim that relations are confidential, is not borne out by the facts, it is obvious that the right to rely upon representations or a full disclosure of all material facts cannot be sustained on this ground, as where the inference of trust and confidence arising from the relation of the parties is rebutted by extrinsic evidence showing that no confidence was actually reposed, or where the relation itself is insufficient to justify the reposing of confidence with respect to the particular transaction involved." Supporting the principle announced by C.J., supra, are the cases of Champion v. Woods, 79 Cal. 17, 21 P. 534, 12 Am. St.Rep. 129; In re Malchow's Estate, 143 Minn. 53, 172 N.W. 915.

■ Appellee in this case sued appellant for damages for an alleged fraud in the purchase of his interest in the partnership property at less than its value because appellant had withheld from him certain material facts concerning the value of the property, which facts were not known to him. The testimony of appellee shows, when asked by his counsel about the relation between them, that it was always pleasant and that he reposed absolute confidence in appellant at all times and relied upon him to disclose the truth about the values of the leases. Certainly this state of facts, if unchallenged, would authorize the court to assume that appellant owed appellee the duty to disclose

all matters known to him which affected the value of the property; yet, upon a rather vigorous cross-examination, appellee admitted he believed that appellant had overcharged him on an account in 1934; that in adjusting their differences he looked after his own interest and did not expect his partner to do so for him; that appellant had been unfair to him in demanding that he withhold $200 to purchase some outstanding small interests in the lease, feeling that he was the "underdog," he could not help himself; that appellant had not carried out his contracts with him in several instances and that for a year he had been thinking it was best to get loose from appellant; that his confidence in appellant had been shaken and that he had made cut-throat contracts with appellant to bring about an end to the partnership; that when appellant sued him in 1934 for debt and accounting and for dissolution of the partnership, he felt like appellant was overbearing and that it would be best for them to be loose from each other.

It is undisputed that appellant had sued appellee for debt, accounting, and dissolution of the firm in 1934, and that the suit was pending in 1935, when the final deal was consummated between the parties, although the differences in the accounts were being liquidated upon an agreed basis. Appellant testified to matters which indicated they were dealing with each other at all times at arm's length as man to man, without reference to a copartnership, both parties dealing with a view to severing their relations. Appellant admitted he did not disclose all the information he had with reference to prospective purchasers of leases, nor that he had contracted to sell one of the leases before June 23, 1935; that he considered those things none of appellee's business; that both he and appellee at all times while dealing with each other tried to drive as hard a bargain as they could for their respective interests. These matters, as we view them, raised an issue of whether or not appellee relied upon appellant to disclose all material facts in his possession affecting the value of the partnership property. Appellant submitted to the court and requested the giving of an issue. inquiring if the parties were dealing with each other at arm's length. This was refused, and assignment of error No. 3 is based on the court's refusal. Assignments Nos. 5 to 12, inclusive, challenge the rulings of the court in refusing requested issues submitting whether or not appellee relied upon appellant to disclose all material facts concerning the several alleged items of information possessed by him and not disclosed to appellee. We hold these issues should have been submitted, and that for their rejection the case should be reversed.

Appellee instituted this cross-action, based upon the fraud of appellant in failing to disclose information in his possession which rendered the leases more valuable than represented to appellee, and the burden of proof was upon appellee to show by a preponderance of the evidence that appellant was aware of the alleged facts and that he failed to disclose them as was his duty to do. The court, in submitting the several grounds alleged, as we construe the issues, placed the burden on appellant to show that he did disclose them. For example, the manner in which they were submitted, one issue reads: "Do you find from a preponderance of the evidence that prior to June 27, 1935, W. H. Peckham made full and complete disclosure to F. T. Johnson of all the material facts, if any, concerning the interest expressed to W. H. Peckham by the Mudge Oil Company in the purchase of the Alice Johnson lease?" As worded, the issue did not place the burden of proof on appellee to show by a preponderance of the evidence that Peckham had failed to make such disclosure, but rather that the burden was on appellant to show he had made such disclosure.

There were four similar issues submitted covering as many allegations of withholding known facts from appellee, upon which the cross-action was based. There were no requested issues by appellant to properly submit the burden of proof, but the objection to the court's charge pointing out the specific error was sufficient to entitle appellant to its consideration by this court. 41 Tex.Jur. p. 1059, § 249, and cases there cited. Appellant's assignments of error Nos. 11 and 12 complain of these issues. We think they are well taken.

Assignments Nos. 1 and 2 complain that the court, without a finding by the jury of whether or not that legal relation between the parties as partners had been affected by subsequent acts, found as a matter of law that it existed at the

time of the trade and rendered judgment for appellee for one-half of the profits derived by appellant when he sold the leases. From what we have said, it follows that we consider this reversible error, and the assignments must be sustained.

The requested special issue by appellant inquiring if the oral agreement by which appellee agreed to sell his interest to appellant was had on Tuesday, prior to Sunday June 23, 1935, would not avail him anything even though answered in the affirmative, since it would have been unenforceable under the statute of frauds. It would only have determined an evidentiary matter about which the testimony conflicted and was not an ultimate fact issue in the case, and it was not error for the court to refuse it.

There are many objections and exceptions to the issues submitted on account of the manner in which they are formed, submitting mixed questions of law and fact, and because there were expressions therein confusing to the jury, etc., some of which we consider contain a degree of merit while others do not, but we have not attempted to discuss them at length in view of a reversal of the case, since the same conditions may not arise upon another trial of the case.

We commend counsel for both parties for the able manner in which this case has been briefed; their suggestions have been helpful to the court; neither, however, have been able to produce any decided cases directly in point on the view we have taken in this opinion, and we have been unable to find such. It appears that a similar question has not been before our courts, but viewing the controverted issues as we do, based upon the evidence before us, we have deliberately reached the conclusions herein expressed.

For the reasons assigned, we reverse the judgment of the trial court and remand the cause for another trial.

## On Motion for Rehearing.

The appellee has filed a motion for rehearing in this case in which he earnestly insists that we reached an erroneous conclusion as expressed in our original opinion.

We are much impressed with the thoroughness and frankness exhibited by counsel in this motion, and have again studied the record most carefully with the matters in mind, as raised therein; but we cannot agree with his contentions.

The effect of his argument is that, since it is conceded the parties were partners and that a copartnership existed between them, it must follow as a matter of law that a fiduciary relation existed between them; that this relation produced the legal presumption that all dealings between them brought them under the rule announced in Dawson v. National Life Insurance Co., 176 Iowa, 362, 157 N.W. 929, 937, L.R.A.1916E, 878, Ann.Cas.1918B, 230, in which it was said: "We are of opinion that a fiduciary relation should be held to exist between a managing officer and stockholder, with relation to the latter's shares, and that any contract between them by which such officer acquires profit out of the same to the detriment of the shareholder should be held presumptively fraudulent and voidable." This same principle is announced by Judge Simpkins in his work on Equity, at page 566.

In support of his contention he lays much stress on the case of Morton Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1. In that case the parties entered into a joint adventure to lease certain property for a period of years; one of the parties was, by mutual consent, to manage and control the property for the joint use of both, while the other was to contribute his share of expenses, and together they were to share the profits and losses in a manner agreed upon. Certain valuable rights were contained in the lease contracts relating to options between themselves and the lessor to be determined at the end of the lease. Shortly before the expiration of the lease contract, the one to whom had been intrusted the management made a contract with the lessor, beneficial to himself but detrimental to his partner. The latter attacked the contract, invoking the rule contended for by appellee in this case. The court held the relations existing between the parties were similar to those between partners, and that the same strict rule of good faith and scrupulously fair dealing were required; that a fiduciary relation existed between them; that the one was under every obligation to disclose to the other everything he knew and did, that would in any way affect the interests of the latter. The language used is indeed very strong, and we indorse it all. There is nothing in that case to indicate

a lack of confidence and reliance in each other throughout every detail of the transaction. In this lies the distinction between that and the case before us.

We do not hold differently to the principles announced in the New York case. We do not have the same facts to deal with; some are similar but others are materially different, and our conclusions are based on those facts which did not appear in the case referred to above.

As we construe appellee's contention, it is that since the parties were admittedly partners, a fiduciary relation existed between them by which Peckham was required to make known to Johnson all matters within his knowledge which would affect Johnson's interest, regardless of whether or not Johnson relied upon him to do so. This, as an abstract proposition of law, standing alone is sound. The relation between partners is so well recognized by law that it is summarized as a fiducial one. This carries with it the idea that they must of necessity rely upon the integrity and good faith of each other and requires no proof that they have done so. The law presumes that it was done. This presumption of law is grounded in one sense upon an equitable rule that each has done what he should do.

We recognize the rule and believe in its rigid enforcement; but we hold that this presumption may be successfully attacked and even overcome by proper evidence. Equity is reason. It will not intrude where the law dwells. It will not enforce as true that which is false. It regards the substance and not the form; it looks through superficial fictions and acts upon the facts. Chambers & Co. v. Little (Tex.Civ.App.) 21 S.W. (2d) 17 (writ refused); Simpkins, Equity, 96.

There is a technical distinction between what is commonly known as a "confidential relation" and strictly a "fiduciary relation," although the terms are frequently used interchangeably. We construe the former as covering every form of relation between parties wherein confidence is reposed by one in another, and he relies and acts upon the representations of the other and is guilty of no derelictions on his own part; while the latter is made to apply more especially to the legal relations between parties created by law or by the nature of the contract between them where equity implies confidence and reliance in the consummation of the purposes for which the relation was created. See Roberts v. Parsons, 195 Ky. 274, 242 S.W. 594; In re Cover's Estate, 188 Cal. 133, 204 P. 583.

The Supreme Court of Oklahoma said in case of Reeves v. Crum, 97 Okl. 293, 225 P. 177, 179: "The expression 'fiduciary relation' is one of broad meaning, including both technical fiduciary relations and those informal relations which exist whenever one man trusts and relies upon another." To the same effect is the case of Wells v. Shriver, 81 Okl. 103, 197 P. 460.

In Higgins v. Chicago Title & Trust Co., 312 Ill. 11, 143 N.E. 482, it was held: "A fiduciary relation is not limited to cases of trustee and cestui que trust, guardian and ward, attorney and client, nor other recognized legal relations, but it exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed, and the origin of the confidence is immaterial, and may be moral, social, or domestic, or merely personal." See, also, Mors v. Peterson, 261 Ill. 532, 104 N.E. 216.

In Wyoming the court held in case of Hoge v. George, 27 Wyo. 423, 200 P. 96, 18 A.L.R. 469: " 'Fiduciary relationship,' within the rule that a contract is illegal if its object or tendency is to cause unfaithful conduct by a fiduciary, must be a relationship from which the law infers or presumes the exercise of undue influence; the test being whether there was confidence reposed on one side and accepted on the other, with a resulting dependence by the one party and influence by the other." See, also, Rowe v. Freeman, 89 Or. 428, 172 P. 508, 174 P. 727.

In Studybaker v. Cofield, 159 Mo. 596, 61 S.W. 246, 250, the Supreme Court of Missouri held: "It is not every guardian, attorney, or priest, quia eo nomine, who is to be adjudged to hold a fiduciary relation with the party in regard to a particular subject. It is in each case a question of fact. The law regards the real, rather than the nominal, condition."

We are not called upon in this case to either condemn or condone the acts of the parties, and it would be improper for us to express our views with reference to the good or bad morals involved. Nor do we think the often discussed prin-

ciple of unconscionable contracts is involved under the facts before us.

There appears in the record before us ample testimony to raise the question of whether or not the presumption indulged by law, that a partner may rely upon his associate in business to make full disclosures of all matters pertaining to the joint property, was in fact relied upon by Johnson; the law will presume that he did so rely, but under proper testimony we think the presumption can be overcome and resolve itself into a question for jury determination. The precise question of whether or not this presumption may be overcome by evidence, it seems, has never been decided by any court. The diligence disclosed by counsel's exhaustive brief leads us to believe if such was available it would have been found; we ourselves have carefully searched for such authority and have found none. The principle seems right and proper to us, and we are therefore venturing to assert it.

Appellee also complains that we erred in our holdings as to the burden of proof upon the issues submitted. Our opinion in this respect was based upon the conclusion reached regarding the matters hereinabove discussed. If we are correct in our holding that the presumption indulged by law, that one partner is in duty bound to disclose all material facts about their common property to the other, may be overcome, or at least attacked in a way as to make it an issuable fact, then it follows that the rule must be applied that one attacking the validity of a transaction has the burden of proving its invalidity. While upon the other hand if we are wrong in that holding, we are equally wrong in our rulings on the burden of proof; for if the duty imposed by law upon a partner to make such disclosures is inflexible enough that he cannot be discharged from the obligation under any circumstances, then it would be proper to place the burden of proof upon him to show he had discharged his obligation. See Baugh v. Houston (Tex. Civ.App.) 193 S.W. 242 (writ refused).

In the case of Moor v. Moor, 24 Tex. Civ.App. 150, 255 S.W. 231, 234, the court had under consideration a suit by the wife against her former husband to rescind a division of the community property made between them upon the grounds that the husband at the time of the division had concealed from her certain properties and she was not in a position to know about them at the time of the division. (This case is applicable in some respects to the first question discussed by us in this motion.) With reference to the burden of proof in that case it was said: "Nor do we think that an agreement between husband and wife, who have actually separated, intending that the separation shall be permanent, to divide their community estate, is, from the nature of their marital relation, prima facie void as to the wife, and throws upon the husband the burden of proving that the agreement is fair and equitable. In our opinion, the validity of such an agreement should be determined by all the facts, circumstances, and conditions surrounding the transactions and affecting the parties. If their relation is such as would probably enable the husband, from his knowledge and the condition of the property, to deceive his wife as to its value, or take advantage of her condition, and he induces her to enter into an agreement to divide the estate, which she seeks to avoid on the ground of fraud, then his relation to her as husband should be considered, as any other fact in connection with the circumstances surrounding the transaction, in determining its character. But there is no presumption in law that the agreement is fraudulent, from the bare fact that the parties are husband and wife."

In the view we take of the case as a whole, we think our original holding on this point is correct.

We do not think appellee was entitled to a peremptory instruction, and this is the effect of the judgment rendered.

■ In our former opinion we sustained appellant's first and second assignments of error, which challenged the action of the court in rendering judgment for appellee for $3,750 without submitting to the jury the issue of the amount of damages sustained by appellee.

The pleadings of appellant raised the issue of the amount of interest appellee had in the property because of previous transactions, as well also what interest was actually conveyed by the assignments. The evidence was undisputed that appellee had previously conveyed Godwin and Taylor certain interests and the part retained by him was charged with $500 to be paid in oil runs; true the outstanding interests were purchased out of the $1,500 con-

tracted by appellant to be paid to appellee, but whether these purchases were actually made by appellant or appellee is not clear; then, too, appellee settled the $500 oil run debt for $400, saving to himself $100. This was an action for damages for the alleged fraud, and if recovery can be had it must be for the proportion appellee's interest in the property bears to the profit made by appellant on the sale if that is to be taken as the measure of his damages. If the evidence upon another trial is the same as upon the former in this respect, the amount of his damages should be determined as a matter of fact by the jury.

We believe we reached a proper solution of the matters presented on this appeal, and the motion for rehearing is overruled.