**E. Y. CHAMBERS & CO., Inc., v. LITTLE et al. (No. 597.)**

Court of Civil Appeals of Texas. Eastland. Oct. 4, 1929.

Rehearing Denied Nov. 1, 1929.

Cockrell, McBride, O'Donnell & Hamilton, of Dallas, for appellant.

Barker & Orn, of Cisco, for appellees.

LESLIE, J. Eula Little and her husband, Eddie Little, appellees brought this suit against E. Y. Chambers & Co., Inc., appellant, for title and possession of two lots situated in Cisco, Tex., and to cancel a deed of trust lien against the same, and to set aside a trustee's deed conveying said premises to appellant under foreclosure proceedings. The trial was before the court and jury, resulted in a verdict upon which a judgment was rendered in favor of appellees, and the defendant has appealed. The respective contentions of the liti-

gants and the testimony relative to each will be set forth in their proper relation to each other.

Eula Little and her husband base their claim for relief upon the contention that a simulated and fictitious indebtedness and lien were created against their homestead, and that, the appellant's purported title and interest in the property being derived from a sale under a deed of trust merely evidencing such debt and lien, the appellant's claims should be set aside and the purported debt and lien canceled and all clouds by reason thereof removed from their title.

The details of the transactions out of which this suit develops appear to have been cleverly devised, and this contest is waged under the banner of homestead rights.

On June 20, 1927, Eddie Little, desirous of acquiring and improving a homestead for himself and his family, negotiated with W. C. Bedford for the purchase of five lots in the city of Cisco, and, by the arrangements that day entered into, said Little received from W. C. Bedford a duly executed deed to said property, reciting a cash consideration paid in the sum of $500, each lot being valued at $100. No consideration was, in fact, paid.

Eddie Little moved a residence on to the premises and, as found by the jury, has occupied the same as a family homestead since July 10, 1927, until the time of this trial. The residence was placed upon the property about June 20, 1927, and the family occupied the same, as stated, July 10th following.

M. D. Paschall & Son, Crigler Paschall, at this time were the duly authorized agents in Cisco of the Continental Savings & Building Association, and they were authorized to take applications and make loans for the association, such loans to be secured by valid first liens on real estate, as required by law. The loan company in this opinion will be referred to as the association.

According to Eddie Little's testimony, the matter of procuring a loan through the Paschalls from their principal was first discussed about June 20, 1927, at which time Crigler Paschall indicated a willingness to recommend a loan on the property. Said Little at this time suggested that he was then negotiating a loan with other parties, and that, if it fell through, he would take the matter up with the Paschalls. This conversation occurred while said Little was at work on the house, and thereafter, about July 15th following, he testified he informed Paschall that he failed to procure a loan in the amount desired, and that he would take a loan through the Paschalls if as much as $2,500 could be obtained. At the conclusion of this conversation, which is represented as taking place at Paschall's office, he and Paschall went to inspect the property. After such inspection Paschall signified a willingness to recommend a loan for $2,500, with said property as secu-

rity, and inquired what character of title Little had to the property. On being informed by Eddie Little that he had an unrecorded deed, to the same, Paschall stated, "That is all right, but I can't loan money on a homestead," and, according to the further testimony of Little, Paschall then suggested that he (Little) would have to have them (Bedford and wife) make a deed to some one else and let them deed it back to him (Eddie Little), making $2,500 worth of vendor's lien notes against the property, and his company would take up the same. Upon the trial Crigler Paschall denied any such conversation, or that he had made any such suggestion.

It is further testified by Little that, upon returning to Paschall's office from the inspection of the property, Crigler Paschall told his father, M. D. Paschall that a loan of $2,500 could be made upon the property, but that the title was not in very good shape, but if the deed he (Little) had was torn up, and the property conveyed to some one else, his father or his brother, and a vendor's lien note for $2,500 taken, such note could be handled by the association. As noted, the Paschalls deny they suggested or had knowledge of any such scheme or arrangement as that detailed in Little's testimony.

This record comes before us with a jury finding that during the negotiations the plaintiff, Eddie Little, informed M. D. Paschall (1) that he owned the property in controversy, and (2) that said Paschalls were then endeavoring to make the loan for the association, to be secured by a lien on said property. A further jury finding is that Eddie Little, during the negotiations, informed either M. D. or Crigler Paschall that he held an unrecorded deed to the property, executed and delivered to him by said Bedford. In addition, the jury, in answer to an issue submitted in rather general terms, acquits the Paschalls of the charge of collusion with the Littles to defraud their principal, the association. This finding is not challenged as being unsupported, or insufficiently supported, by the testimony.

The original or unrecorded deed from the Bedfords to Eddie Little seems to have disappeared. It was not introduced upon the trial of this case. Eddie Little contended he left it with the Paschalls, who deny that they at any time had custody of the same.

On July 19, 1927, said Bedford and wife executed a deed to J. M. Little (father of Eddie Little), conveying the same five lots to the father, and reciting a consideration of $500 in cash paid. This deed was filed for record the same day. The Littles and Paschalls differ on what next occurred, but the former's testimony is to the effect that Paschall suggested that the last-mentioned deed be left with them, and that he (Eddie Little) proceed to make out to himself a deed from his father and write up two vendor's lien notes, one in

the sum of $2,000 and the other for $500, to be executed and delivered to J. M. Little, and which the association would take up. This purported deed from J. M. Little and wife to Eddie Little recited a consideration of $4,500, $2,000 paid in cash, and the balance evidenced by said notes, which were advanced by the Littles as the basis for the loan which they desired from the association.

Naturally, under the foregoing circumstances, the record title to the property appeared regular and complete in Eddie Little, subject only to the indebtedness evidenced by the two notes purporting to represent the original purchase money obligation and to be secured by an original vendor's lien. The abstract of the property being delivered to the attorneys for the association, it was examined by competent and learned counsel, who approved the same as merchantable, subject to the note and lien aforesaid.

In this connection it may as well be stated that the association, in making the loan, had no notice of any fraud entering into the deal, or any infirmity in the title, unless such knowledge or notice as the Paschalls had was of such character as, when imputed to the association, charged it with knowledge of fraud and infirmity. Such is the agreement in the record.

The association, through its attorneys, to make assurance doubly sure, exacted an affidavit from J. M. Little and wife and Eddie Little and wife, with respect to the facts and bona fides of the deal, as evidenced by the instruments setting forth the purported conveyance from the father to the son, and the notes executed in pursuance thereof. Such an affidavit was furnished and is to be found in the statement of facts. Its contents may be fairly appraised by employing (with the substitution of "affidavit" for "trust deed") the language of our Supreme Court concerning the declarations in an application and deed of trust for a very similar loan terminating in like litigation: "There is no doubt that the application for the loan, and the recitals and declarations in the trust-deed, that the property was not homestead, went as far as words could go to assure the lender that it might safely lend its money without fear that lien would be defeated by the existence of homestead rights." Texas Land & Loan Co. v. Blalock, 76 Tex. 85, 13 S. W. 12, 13.

The father, by his affidavit, testified to the genuineness of the deal as between himself and son, and stated that he made such representations to enable him to sell the notes to the association. Eddie Little and wife testified likewise, and stated that they made such representations for the purpose of inducing the association to make them a loan in the sum of $2,500 with which to take up and extend the time of payment of the $500 and $2,000 notes, with the vendor's lien securing them. These affidavits effected the consummation of the loan, and the association advanced the sum of $2,500, in accordance with the terms of the application and the agreement generally. It took from said J. M. Little an assignment of the notes and the liens securing them, and in extension thereof Eddie Little executed a $2,500 note to the association and vouched for the indebtedness as being the original purchase-money debt secured by original purchase-money liens, all of which were to become the security and the property of the association.

The affidavits contained an additional significant statement in that they set forth that at the date of the deed from J. M. Little, the father, to Eddie Little (August 11, 1927), the said Eddie Little and wife occupied as their homestead an acre of land out of the N. W. ¼, Sec. 127, Blk. No. 3, Houston & Texas Central Railway Company survey, as shown by deed records of Eastland county, vol. 202, p. 403. Upon the trial, however, Eddie Little testified that he and his family had, in fact, resided on the land involved in this controversy since July 10, 1927, and not upon the acre of land above described. The jury's finding was in accordance with his testimony.

Enough of the details of the transaction have been set forth to reveal the purpose of the parties and the nature of the scheme inducing the loan, and now, if it may be conceded, as appears to be the general finding of the jury, that the Paschalls were not in collusion with the Littles to perpetrate a fraud upon their principal, nevertheless there are certain other conclusively established facts appearing in this record which, in our judgment, preclude the Littles from a recovery in this suit.

By instituting this suit in trespass to try title, the Littles assumed the burden of establishing, as they have charged, that the entire rights and interests claimed by the appellant under and by virtue of the trustee's deed were derived from and rest solely upon a fictitious and simulated consideration, since it all grew out of an effort to mortgage a homestead. This cannot be true to the extent claimed. At least to the extent of $200, the purchase price of the two lots in controversy, the consideration recited in the deed of trust is genuine. It is undisputed that upon the execution and delivery of both of the deeds by W. O. Bedford he received none of the purchase money, though the instruments recited it was paid. In each instance the purchase money remained unpaid and the true vendor's lien arose by operation of law to secure payment of the purchase price to Bedford. Of this the Littles, Paschalls, and Bedford were all charged with a knowledge, and they in fact so understood. Neither Eddie Little nor his father seems to have had the money with which to pay

the purchase price, and it is undisputed that it was the specific understanding by the Littles, Paschalls, and Bedford that the original $500 consideration for the five lots was to be paid from the proceeds of the contemplated loan from the association. Upon the approval of the title the association forwarded its check for $2,500 to the Paschalls, to be by them delivered to J. M. Little, who thereupon indorsed the same to Eddie Little, who, together with Crigler Paschall, went immediately to the bank, cashed the check and, with a part of the proceeds thereof, purchased a certified check for $500 which he delivered to said Paschall to be delivered by him to the said Bedford in satisfaction of the purchase price of the lots. This was in accordance with the previous understanding among the parties to the transaction, and in this manner, and with the association's funds exclusively, Eddie Little testifies he paid his true vendor for the lots, and that the balance of the loan he used in the payment of promiscuous debts. In the course of his testimony he states: "He expects to hold title under the first deed." To procure the loan, the Littles proffered a first lien as security, and the association expected such. The Littles knew or were charged with the knowledge that the law forbade a loan by the association upon any security but a valid first lien on real estate. In procuring the loan it was divided into two parts, the first being made exactly equal to the purchase price due Bedford. Unquestionably, this was in accordance with the understanding of the parties and the specific intention of the Littles to pay from the proceeds of the loan the true vendor of the land, and it will be observed that the Paschalls saw to its appropriation as such.

■ Therefore, granting that the security for the loan failed to the extent of the $2,000 note by reason of the knowledge on the part of the Paschalls as to the alleged simulated and fictitious indebtedness and lien properly imputable to the association (the jury having found against collusion), nevertheless the $500 actually entering into the true purchase price of the property occupies a different status, and to the extent that it entered into the loan, and evidenced by the deed of trust, it gives vitality to such deed of trust supporting a legitimate sale of the properties embraced therein. To our minds it should be regarded as wholly immaterial that the Littles represented J. M. Little as being the owner of the obligation rather than the Bedfords. He did owe $100 for each of the five lots. A first lien in favor of Bedford secured the indebtedness. The Littles solicited the loan of the association and proposed to secure it with a first lien. No other character of lien would have been considered by the association as the security for its funds. In this situation we are warranted in an application of the maxim that equity regards the substance and not the shadow of things, and, in disregarding mere form and looking at the substance, we are impelled to disregard the misrepresentation by Eddie Little as to who, in fact, held the debt due the vendor and the lien securing the same, and we hold that the debt and lien actually existing, and the association having been solicited under the arrangements detailed to furnish the money with which to pay for the lots, it, in fact, became, at least to the extent of the purchase price of the lots in controversy, the beneficiary of and the owner of the debt and lien held by the true vendor. We follow the fact and not the fiction.

This, we think, is a correct holding, regardless of whether the Paschalls or either of them did or did not participate in collusion with the Littles to defraud their principal. Texas Land & Loan Co. v. Blalock et al., 76 Tex. 85, 13 S. W. 12; Flynt et al. v. Taylor et al., 100 Tex. 60, 93 S. W. 423.

■ A portion of the loan being secured by a valid lien against the property, a sale under the deed of trust, made in accordance with its terms, passed title to the property. As stated in W. C. Belcher Land Mortgage Co. v. Taylor et al. (Tex. Com. App.) 212 S. W. 647, 649: "A sale made under a deed in trust for a sum larger than the amount with which the property is properly chargeable is not void, and a power of sale in such deed can be exercised if any part of the debt is due and owing. * * * The amount of the indebtedness secured by the vendor's lien was included in the note secured by the deed in trust, and, same being due and payable, and default made in its payment, a sale was authorized under the deed in trust. Mere excess, if any, in the amount of the note does not affect the validity of the sale."

■ For the foregoing reasons we believe the sale under the deed of trust in the instant case to be valid. It passed title, and the court should have instructed a verdict in favor of the appellant; the suit being in the nature of trespass to try title, and the plaintiffs having failed to make out their case.

■ What has been said is principally upon the theory that equity regards the substance and not the form, and that it looks through superficial fictions and acts upon the facts, giving to the latter controlling effect.

■ We come now to a discussion of the principle of subrogation as applied to the facts of this case. Upon this ground we believe the appellant is entitled to have this case reversed and rendered in its favor. As stated in 25 R. C. L., page 1343, § 26: "It is well settled that where the security given for the loan which is used to pay off an incumbrance turns out to be void, although the person taking it expected to get good security, he will be subrogated to the rights of the

holder of the lien which the money advanced is used to pay; and that in such case the person advancing the money cannot be regarded as a stranger or volunteer, there being no intervening equity to prevent. The rule has been applied where the security fails because of partial or total want of title in the person giving it, and also where it fails of its purpose because of some defect in its execution, or because of want of authority or capacity in the person executing it. Thus the lender of money upon the security of a deed of trust is, in case the deed of trust proves to have been forged, *entitled to be subrogated to the lien of taxes and of a prior valid incumbrance discharged out of the proceeds of the loan.*" (Italic ours.)

Of the class of cases mentioned in the quotation we cite Helm v. Lynchburg Trust & Savings Bank, 106 Va. 603, 56 S. E. 598. This opinion is by the Supreme Court of Virginia, and it was there held that, where an alleged forged deed of trust was executed to obtain a loan, of which various sums were used to pay taxes, costs of recording, and satisfaction of a deed of trust which was a valid lien on the property, the lender, on the loss and cancellation of the deed of trust to him as a forgery, was entitled, as against the innocent owner of the property, to subrogation to the rights of the claimants, whose valid liens against the property were satisfied out of the loan advanced upon such forged security.

Certainly, if a lender of money upon forged security is entitled to subrogation to valid liens and taxes as against the owner of the property, then there is no good reason why the association in the instant case would not be entitled to subrogation, under the facts detailed, to the true vendor's debt and lien. The case in hand is a much stronger one for the application of the principle of subrogation than the Virginia case. In this case Eddie Little solicited a loan, representing that its security would be a first lien. The association expected that character of security and the funds advanced upon the loan were applied to the payment of the true vendor's claim, and in satisfaction of the only purchase money owed any one for the lots. Further, under no theory of the case can the association be regarded as a volunteer.

The rule announced in the above quotation is abundantly supported by numerous authorities from various jurisdictions, cited by the authors of that splendid work. In connection with these authorities, and in support of the appellant's right of subrogation under the facts of this case, we cite from the opinions of our own courts and others: Flynt v. Taylor, 100 Tex. 60, 93 S. W. 423; Texas Land & Loan Co. v. Blalock, 76 Tex. 85, 13 S. W. 12; Dixson v. National Loan & Investment Co. (Tex. Civ. App.) 40 S. W. 541; M. Kangerga & Bro. v. Willard et ux. (Tex. Civ. App.) 191 S. W. 195; Pioneer Savings & Loan Co. v. Paschall et ux., 12 Tex. Civ. App. 613, 34 S. W. 1001; Southern Cotton Oil Co. v. Napoleon Hill Cotton Co., 108 Ark. 555, 158 S. W. 1082, 1084, 46 L. R. A. (N. S.) 1049, and notes.

█ Subrogation is said to be the substitution of another person in the place of a creditor to whom such person succeeds. The principle has a very liberal application. Judge Story, in his work on Equity Jurisprudence, characterizes this principle as "a doctrine belonging to an age of enlightened policy and refined, although natural, justice."

The Dallas Court of Civil Appeals, speaking through its Chief Justice Jones, in Galbraith-Foxworth Lumber Co. v. Long, 5 S. W. (2d) 162, 167, used this language: "The right of subrogation is not dependent upon contract, agreement, or stipulation, or upon privity or strict suretyship; but it is a mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, ought to pay it."

The Supreme Court of Arkansas, in Southern Cotton Oil Co. v. Napoleon Hill Cotton Co., supra, says of subrogation: "Its phases are various, but it preserves its characteristic features throughout. It is the machinery by which the equity of one man is worked out through the legal rights of another. * * * It rests upon the maxim that no one shall be enriched by another's loss, and may be invoked wherever justice and good conscience demand its application, in opposition to the technical rules of law which liberate securities with the extinguishment of the original debt. This equity arises when one not primarily bound to pay a debt, or remove an incumbrance, nevertheless does so; either from his legal obligation, as in case of a surety, or to protect his own secondary right; or upon the request of the original debtor, and upon the faith that, as against the debtor, the person paying will have the same sureties for reimbursement as the creditor had for payment. And this equity need not rest upon any formal contract or written instrument."

It is further stated, in the same opinion by the same court, that: "The parties may not have had subrogation in their minds at all when they made the contract, but that fact alone would not control in a question of application of the doctrine. Equity will apply it, though the parties may never have thought of it, if it is not inconsistent with the contract or in violation of any one's legal rights, and if justice demands it."

All leading authorities are to the same effect, and there has not fallen under this court's observation a state of facts offering more justification for the application of this wholesome rule of equity than do the facts of the instant case.

We are aware that there is a solicitude in the Constitution and laws of our state for the homestead rights of the family. This is

properly so, but neither the Constitution nor the laws undertake to protect an alleged homestead as against claims for "the purchase money thereof, or a part of such purchase money, or the taxes due thereon." The Constitution itself, article 16, § 50, expressly makes the homestead claims subordinate to the incumbrances above mentioned.

And it may be further observed that, if the homestead rights in any manner attach to land charged with the preceding equities and incumbrances mentioned in the Constitution, the husband, acting in good faith, has the right to adjust those equities and incumbrances and in their adjustment substitute for them new liens. Gillum v. Collier, 53 Tex. 592; Clements v. Lacy, 51 Tex. 160.

■ This proposition has its bearing upon the authority of Eddie Little to negotiate and deal with the homestead, in so far as the negotiations related to the actual purchase money and the original vendor's lien thereon.

We thus arrive again, and by force of another reason, at the conclusion that the deed of trust under which the property in question was sold, was supported by and composed, in a substantial part, at least, of the debt due W. C. Bedford, as well as the lien securing its payment to him. Both the original purchase money and its protecting lien entering into and becoming a part of said deed of trust, and the sale under that instrument being regular, upon the rule announced in the case of W. C. Belcher Land Mortgage Co. v. Taylor, supra, the appellant acquired a valid title, and a verdict should have been instructed in favor of the defendant.

■ In seeking the judicial annulment of the contract for illegality, the appellees failed in a material sense to discharge the burden of proof cast on them by law. M. Kangerga v. Willard, supra.

In the consideration of this appeal the case of Pickett v. Dallas Trust & Savings Bank (Tex. Civ. App.) 13 S.W.(2d) 195, has not escaped our attention. A writ of error has been granted in that case, and, since the facts of the instant case are somewhat different from those involved in the Pickett Case, we have determined to rest our opinion and judgment upon the grounds hereinbefore discussed. If the opinion by the Court of Civil Appeals in said case remains undisturbed by our Supreme Court, undoubtedly it would furnish ample authority for reversing and rendering the judgment in this case, but we rest our judgment upon the grounds stated.

Appellant presents other propositions which it urges as sufficient grounds for the reversal of this judgment. In view of our holding on the propositions discussed, it is unnecessary for us to pass on these propositions.

For the reasons assigned, the judgment of the trial court is reversed, and this cause is here rendered in favor of the appellant.