**BARREDA CORPORATION et al. v. BALLENGER et al.**

No. 3194.

Court of Civil Appeals of Texas. Beaumont.

Feb. 3, 1938.

Rehearing Denied March 30, 1938.

Dissenting Opinion April 28, 1938.

---

[1] Rehearing pending at date of publication.

against the Barreda Corporation to recover the title and possession of 6,419.61 acres of land, a part of the Ojo de Agua tract of land in Cameron county, filed on the 11th day of July, 1936. On the 2d day of October, 1936, C. P. Barreda, with permission of the court, filed his plea of intervention, followed by the filing of original and supplemental pleadings by all parties to this litigation. On the 4th day of November, 1936, judgment was entered in favor of appellees on an instructed verdict for title and possession of the land, and for other relief prayed for. The appeal was perfected to the San Antonio Court of Civil Appeals by the original defendant and the intervener, and was transferred to this court by order of the Supreme Court.

By deed dated the 21st day of November, 1931, C. P. Barreda, joined by his wife, conveyed the land in controversy to the Barreda Corporation for and in consideration of five vendor's lien notes, each for the sum of $50,000, of even date with the deed, and numbered 1 to 5, and maturing respectively one, two, three, four, and five years after date. These notes passed into the possession of Mrs. Ballenger, and, together with the superior title to the land, were sold at her trustee's sale, and bought by her for $40,000, which she credited against her claimed indebtedness against intervener. It was the theory of appellees' action in trespass to try title that, owning these notes and the superior title, she had the right to rescind the original sale, which she exercised, thereby vesting in her the superior title to the 6,419.61 acres of land.

The pleadings and the evidence present the following issues: (1) Did the evidence raise a jury issue that the National Bank of Commerce, a prior holder of the five vendor's lien notes, held the legal title, the paramount title, to the land; (2) as a matter of law, with no issue for the jury, did the sale of the notes by the trustee vest in Mrs. Barreda the superior title to the land; (3) as a fact issue for the jury, did the evidence support any defense alleged by appellants against the sale of the notes by the trustee; (4) did the evidence, as a fact issue for the jury, support Mr. Barreda's cross-action for damages on his allegation that the sale by the trustee was fraudulently made; (5) did the court err in refusing to disqualify appellees' attorneys, Seabury, Taylor & Wagner, and in permitting them to appear in behalf of appellees, and to prosecute this suit against

R. A. Dunkelberg, H. L. Faulk, and Graham, Graham & Graham, all of Brownsville, for appellants.

Montgomery & Bowie, of San Benito, and Seabury, Taylor & Wagner, of Brownsville, for appellees.

WALKER, Chief Justice.

This was an action in trespass to try title by appellees, Mrs. Ethel Ballenger joined by her husband, Joe G. Ballenger,

appellants. It is our conclusion that all these issues must be answered in support of the judgment of the lower court.

■ The National Bank of Commerce of San Antonio did not hold the superior title to the land. The vendor's lien was reserved in the deed by C. P. Barreda and wife to the Barreda Corporation to secure the payment of the five vendor's lien notes; these notes and lien and superior title were conveyed by Barreda and wife by an instrument in writing dated the 2d day of February, 1933, to E. C. Breedlove as trustee to secure the payment of one note for the sum of $11,756 due by the grantors to Mrs. R. A. Plummer, and a second note for the sum of $37,046.35 due by Barreda to appellee Joe G. Ballenger, and the trustee was vested with title to the notes, lien, and superior title to the land in trust for the benefit of the holders of these notes. By an instrument in writing dated the 1st day of February, 1935, Mrs. Plummer assigned her note and her interest in the five Barreda notes, and in the superior title to the land, to Joe G. Ballenger. By an instrument dated the 8th day of April, 1935, Ballenger assigned the two notes due him by Barreda, together with the five vendor's lien notes held by him as collateral, and his interest in the 6,419.61 acres of land to his wife, Mrs. Ethel Ballenger. On the 7th day of September, 1935, Ballenger and his wife assigned the two Barreda notes together with the five collateral notes to the National Bank of Commerce of San Antonio; we quote as follows from this transfer: "We, Joe G. Ballenger and Ethel Ballenger * * * do now and hereby and by these presents transfer and assign to the National Bank of Commerce, its successors and assigns, the vendor's lien so reserved and retained in and by said deed from C. P. Barreda to the Barreda Corporation, with all and every right that we or either of us could or would have in and to same, and with and for the purpose of enforcing all of the said liens, collaterals, and pledges pertinent to each, all and any and every of said notes, with right of foreclosure." This transfer was made to the bank to secure it in an indebtedness of $10,000 due it by Joe G. Ballenger. The Ballengers paid this indebtedness to the bank, and on the 11th day of May, 1936, the bank, by an instrument in writing, conveyed back to the Ballengers all collateral held by it as security for its indebtedness against the Ballengers; this assignment recited that the bank "desires to and does hereby reinvest the said Joe G. Ballenger and Ethel Ballenger in their respective claim, right and title in and to said notes and collateral thereto." There was no language in this assignment conveying back to the Ballengers the superior title to the 6,419.61 acres of land. The National Bank of Commerce did not own the superior title to the land for the following reasons: (1) The conveyance by the Ballengers to the bank did not convey the superior title to the land, but only the vendor's lien against the land with the right of foreclosure; (2) if that conveyance should be construed as conveying the superior title to the bank, it was only a conveyance in trust to secure the Ballengers' indebtedness to the bank, and when that indebtedness was paid the title held by the bank to secure its payment was extinguished, 19 R. C.L. 453; (3) at the time Ballenger and wife conveyed their collateral to the bank, they did not hold the superior title to the land, but it was vested in Breedlove as their trustee, and he did not join in the conveyance.

■ The sale by the trustee to Mrs. Ballenger of the five vendor's lien notes against the land in controversy, together with the superior title to the land, was in all things regular, and vested in her the title to the notes and the superior title to the land, with the right of rescission. Appellants make the following propositions against the validity of this sale by the trustee: The note for $37,046.35, secured by the deed of trust covering the five vendor's lien notes, was void; this contention, if conceded, would not invalidate the sale. Cameron County Water Improvement District No. 8 was organized in 1929, and voted bonds to the amount of one million dollars to improve the district with a drainage system, etc. On the 6th day of September, 1929, the district made a contract with Joe G. Ballenger to construct its irrigation system, on the agreed price of $283,000 to be paid in the manner set out in the contract; 15 per cent. of the contract price was to be retained by the district, evidenced by its notes. C. P. Barreda made a separate contract with Ballenger guaranteeing the payment of this "retained percentage"; this retained percentage amounted with interest to $37,043.-35, for which Barreda executed this note, and in the course of his subsequent dealings with Ballenger this note was secured in the manner stated above. It is the con-

tention of appellants that the note for the retained percentage was void, for the reason that it created a debt against the district without a vote of the people, and as the principal debt was void, Barreda's guaranty of the debt was also void. Appellants also asserted other grounds of invalidity. The parties voluntarily made the contract which was executed for them by the trustee in the manner agreed upon, without invoking the aid of the courts. The following proposition of law announced by Judge Sonfield in Hall v. Edwards, Tex.Com.App., 222 S.W. 167, 169, sustains the sale against the contention that the note for $37,046.35 was void; in the Hall Case the title to real estate was attacked on the ground that the note secured by the deed of trust, foreclosed by the trustee's sale, was void; sustaining the sale Judge Sonfield said:

"But the illegality of the transaction did not prevent the exercise of the power of sale conferred upon the trustee, by agreement of the parties, through the deed in trust. At this sale plaintiff in error became the purchaser, and acquired the title remaining in Pennington and Hill though the retention of the vendor's lien and that of defendant in error acquired by her deed from Hughes." (The indebtedness in this case was secured by the deed in trust as well as by the vendor's lien.) "The sale put an end to the illegal contract. It was fully executed by the parties themselves, acting through the trustee, who, in the execution of the trust, was the agent of all the parties thereto. Plaintiff in error's title, though arising out of the illegal contract, was not dependent upon it; that is, no action of the court was necessary to enforce the contract, or any of its terms, in order to make the title perfect or complete.

"A title or estate so resulting from, and arising out of, the illegal contract, fully executed, will be recognized by the courts; the recognition involving no reference to, or action upon, the contract itself.

"Plaintiff in error not seeking the enforcement of the contract, and not invoking it to sustain a remedy, its illegality is no defense. To permit this defense, under the facts herein, would be to create a right or title in defendant in error dependent entirely upon such contract. It would, in effect, be to enforce the contract on her behalf, enabling her to reap a benefit thereunder. The same principles which

govern courts in declining to enforce an illegal contract in aid of a plaintiff's title inhibit its use to create a title in a defendant."

Appellants cite in support of their contention Cameron County Water Improvement District No. 8 and C. P. Barreda v. De La Vergne Engine Co., 93 F.2d 373, by the Circuit Court of Appeals for the Fifth Circuit, decided December 9, 1937. Had appellees resorted to the courts to foreclose their lien instead of foreclosing it by trustee's sale, the case cited would be in point; on the facts of this case, it is not in point.

■ On a second ground the trustee's sale was valid. Appellants had no defense against the note for $11,756, also secured by the deed of trust and involved in the sale by the trustee. Appellants made no offer to pay this note at any time before the sale by the trustee. In Belcher Land Mortgage Co. v. Taylor, Tex.Com.App., 212 S.W. 647, 649, the court said: "A sale made under a deed in trust for a sum larger than the amount with which the property is properly chargeable is not void, and a power of sale in such deed can be exercised if any part of the debt is due and owing." On facts on all fours with the facts of this proposition the following additional authorities support the sale: Hemphill v. Watson, 60 Tex. 679, 682 (Directly in point); E. G. Chambers & Co. v. Little, Tex.Civ.App., 21 S.W.2d 17, 21; West v. Peters, Tex.Civ.App., 287 S.W. 81, Writ of Error dismissed; Wood v. Eastland Bldg. & L. Ass'n, Tex.Civ.App., 75 S.W.2d 466, 470; North American Bldg. & Loan Ass'n v. Bell, Tex.Civ. App., 88 S.W.2d 633, 636; Corbett v. Sweeney, Tex.Civ.App., 151 S.W. 858, 861, Writ of Error refused; 29 Tex.Jur. p. 971, Mortgages, § 134.

■ There is no merit in the contention that an issue of fact was raised against the conclusion that the notes secured by the deed of trust was the separate property of Mrs. Ballenger, and, therefore, against the validity of the sale made by the trustee only on her request. In reply to this contention we say that all the evidence was to the effect that the Barreda notes were the separate property of Mrs. Ballenger; it would serve no useful purpose to state the details of this testimony. There is no testimony to support appellants' contention that the sale was made in the morning in violation of the local custom that sales

of this character in Cameron county are made in the afternoon. It was conclusively shown that the holder of the notes requested the trustee to make the sale.

Appellant C. P. Barreda by special plea claimed damages against Joe G. Ballenger for breach of his contract to install the irrigation system, and prayed that the notes held by appellees against him be abated to the extent of the damages suffered by him by reason of this breach of contract; his claim of damages on this issue was limited to his right of abatement. The damages prayed for exceeded the amount of the notes. The purpose of this plea was to apply the damages suffered by appellant as an actual payment upon his two notes, and to have the sale declared void for the want of a supporting mortgage debt; and to have the sale set aside in order that appellant might be given such credit. The law does not afford appellant this relief. In 41 C.J. 933, it is said: "In the absence of statutory authority, a sale under the power will not be enjoined merely for the purpose of allowing the mortgagor to set up an independent demand or set-off, if it does not appear that the mortgagee is insolvent or that such claim will otherwise be lost by allowing the sale to proceed."

The Texas statutes do not give the authority required by this proposition, nor does the record raise the issue of the insolvency of appellees. In McDaniel v. Cowart, 109 Ga. 419, 34 S.E. 589, it is held: "The only question for consideration is whether or not the allegations in the petition present a case for the equitable relief sought. There is no charge of insolvency of defendants, or either one of them, and no reason given why she should have the extraordinary remedy of injunction for which she prays. The contract between her and the defendants gives them the power to sell the land in case of default on her part in the prompt payment of either note. The only way in which she could have defeated the exercise of this power was to pay the notes; and the fact that she had an account against one or both the defendants to the amount of her indebtedness to them could not operate, per se, as a cancellation of their contract touching the sale of the land. The remedy on her account is by suit at law, and no reason is assigned in the petition why it is not ample and sufficient. The remedy of the defendants for the recovery of their money on the land is under contract, which, it appears from the petition, they were pursuing."

The court overruled appellants' motion to disqualify Judge S. W. Seabury and his firm from representing appellees on the trial of this case. The ruling of the court in this respect does not present error, requiring a reversal of the judgment, because, on the undisputed facts, appellees were entitled to an instructed verdict. The facts supporting this verdict were of record, and so available to any attorney who might have represented appellees. If the judgment were reversed and the cause remanded, the same judgment would have to be entered on a new trial.

The judgment of the lower court is in all things affirmed.

### On Rehearing.

Mr. Justice COMBS dissents from the conclusion, stated in the original opinion, that the disqualification of Judge Seabury presents an immaterial issue. Because of this dissent we are required to make a finding on the issue of Judge Seabury's disqualification.

The following facts are relied upon by appellants to support their motion to disqualify Judge Seabury: From 1912 to 1934, he was attorney for Mr. C. P. Barreda and his business interests. In 1929 and 1930, he represented Mr. Barreda in the organization of the Barreda Corporation and, after its organization, served this corporation as its vice president and attorney. In a judgment rendered on the 1st day of June, 1935, involving the land in issue in this case, he represented Mr. Barreda and the Barreda Corporation. On his legal advice, Mr. Barreda organized—was the chief promoter in the organization—Cameron County Water Improvement District No. 8, and after its organization he was attorney for the corporation; his son and son-in-law were members of its board of directors. He was the attorney of Mr. Barreda, the Barreda Corporation, and Cameron County Water Improvement District No. 8 until 1934, and they depended upon him for legal advice, and, when given, they followed his legal advice.

The present lawsuit arose out of transactions between Cameron County Water Improvement District No. 8, Mr. Barreda, and the Barreda Corporation, and appellee Mr. Joe G. Ballenger; the facts of these transactions are set out in the orig-

inal opinion. In all these transactions Judge Seabury represented all the parties except Mr. Ballenger. In the sale of the land in controversy by Mr. Barreda to the Barreda Corporation, Judge Seabury prepared the papers and, as vice president of the corporation, he executed to Mr. Barreda the vendor's lien notes given as part of the purchase price. In these transactions—the organization of the two corporations, the sale of the land to the Barreda Corporation—Judge Seabury acted as counsel for Mr. Barreda. He prepared the original construction contract by which the interests of Cameron County Water Improvement District No. 8 and Mr. Barreda were tied together, and by which appellee Joe G. Ballenger was to construct the canal system for the water district; this lawsuit grew out of that contract. When differences arose between Mr. Barreda and Mr. Ballenger on the construction of this contract, Judge Seabury represented the water district and Mr. Barreda. Under his advice, Mr. Barreda executed to Mr. Ballenger the note for $37,046.35, and guaranteed its payment in the manner set out in the original opinion. The refinancing plan outlined in the original opinion was entered into by Mr. Barreda under the advice of Judge Seabury. We quote as follows from a letter dated the 7th day of April, 1933, from Judge Seabury's law firm to Mr. Barreda:

"Mr. C. P. Barreda,

"Brownsville, Texas.

"Dear Mr. Barreda:

"This letter, duplicate of which is hereto attached with request that you note your acceptance at the end thereof and return the duplicate to us, is written to confirm the understanding reached this morning between you and our Mr. Seabury in regard to our representing you in all maatters, including negotiations, compromises and litigation, in respect to the debts owed by you directly and indirectly to others,—limited, however, to the debts now in existence.

"It is impossible at this time to make even a rough estimate of the amount of the work or the value of the services that will be required of us. Therefore, we will at this time charge you a retained of $1500.-00 (in which will be absorbed all charges entered on our books for services rendered you and the Barreda Corporation since November 15, .1932), payable on or before July 1, 1933, to be evidenced by your promissory note, in favor of F. W. Seabury and V. W. Taylor, the payment thereof to be secured by pledge with us of the following securities," etc.

This letter was indorsed: "Accepted; C. P. Barreda."

Attached to this letter was an itemized statement of the charges made against Mr. Barreda by Judge Seabury's law firm for professional services from November 15, 1932, to December 6, 1934, amounting to $4,013.32; among the fees charged against Mr. Barreda was the following item:

"1933. Jan. 16. To conducting negotiations and drawing papers for refinancing your note to John G. Champion, sec. by 5 V/L notes of Co., $50,000.00 each. on 6400 ac. Ojo de Agua, including 1 note to Mrs. Plummer at 2 yrs. for $11,700.00 (Money paid off the note to Champion), and pledge of above V/L notes to secure same, V/L note No. 1, being extended to Nov. 1, 1937, (2) note to J. G. Ballenger, 2 yrs., for $37,141.22, and second pledge of said V/L notes to secure same, (3) assignment, J. G. Ballenger to you of Dist. #8 Notes Nos. 25, 26, 28, 32, 35-9, 42 & 43, p–rinc. & int. $37,141.22 and District bonds securing your guarantee of payment of said notes, and (4) pledge of said District bonds to secure your guarantee of Dist.'s payment to J. G. Ballenger of retained percentage, $31,787.63, under his construction contract with Dist., .. 200.00"

This was the refinancing contract made by Mr. Barreda with Mr. Ballenger and Mrs. Plummer, detailed in the original opinion.

In July, 1935, after he had severed his professional relations with Mr. Barreda and his corporations, Judge Seabury asked permission of Mr. Barreda, through Mr. Barreda's counsel, to represent Mr. Ballenger in the matters in issue in this case; this permission was refused. We quote as follows from Judge Seabury's testimony: "I think I attended to anywhere from seven-tenths to nine-tenths of Mr. Barreda's business. We never had anything like a definite contract to represent Mr. Barreda in his affairs generally or any phase of his affairs generally until the latter part of 1932. Then the contract of employment was made that was afterward set forth in the letter of April 7, 1933. At that time Mr. Barreda had called a meeting of his creditors and was trying to place all of his affairs in the hands of

creditors to work them out, and we had a general arrangement that I was to represent Mr. Barreda in all of those matters."

Judge Seabury also represented the Ballengers against his former clients in the sale by the trustee whereby they acquired title to the five vendor's lien notes and, holding these notes, the superior title to the land.

■ On the facts stated, the adjudicated cases compel us to conclude that the court erred in overruling appellants' motion to disqualify Judge Seabury and his law firm, and· in permitting them to represent appellees in this litigation. In People v. Gerold, 265 Ill. 448, 107 N.E. 165, 177, Ann.Cas.1916A, 636, the court said: "The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. When he has once been retained and received the confidence of a client, he cannot enter the service of those whose interests are adverse to that of his client or take employment in matters so closely related to those of his client or former client as in effect to be a part thereof. Weeks on Attorneys, (2d Ed.) §§ 120, 271; 1 Thornton on Attorneys, § 174. This rule is a rigid one, designed not alone to prevent the dishonest practitioner ·from fraudulent conduct, but as well to preclude the honest practitioner ·from putting himself in a position where he may be required to choose between conflicting duties. He should undertake no adverse employment, no matter how honest may be his motives and intentions. Strong v. International Bldg. Loan & Invest. Union, 183 Ill. 97, 55 N.E. 675, 47 L.R.A. 792. He owes to his client fidelity, secrecy, diligence, and skill, and cannot take a reward from the other side. He is not, as a general rule, allowed to divulge information and secrets imparted to him by his client or acquired during their professional relation unless authorized to do so by the client himself. (Hatch v. Fogerty, 40 How.Prac. (N.Y.) 492. It is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with absolute assurance that the lawyer's tongue is tied from ever discussing it. U. S. v. Costen, C.C., 38 F. 24. This rule has been so strictly enforced that it has been held that an attorney, on terminating his employment, cannot thereafter act as counsel against his client in the same general matter, even though while acting for his former client he acquired no knowledge which could operate to the client's disadvantage in the subsequent adverse employment."

See, also, Peirce v. Palmer, 31 R.I. 432, 77 Am. 201, Ann.Cas.1912B, 181.

■ It is appellants' proposition that the disqualification of Judge Seabury rendered null and void the judgment of the lower court; that his disqualification was analogous to the disqualification of a trial judge. The majority of the court does not accept this as a sound legal proposition. It is our conclusion that the disqualification of Judge Seabury would constitute error, requiring a reversal of the judgment of the lower court, only in the event that appellants were prejudiced, suffered an injury by his representation of appellees. On the uncontroverted facts, as the majority of the court construes the record in this case, appellees were entitled to an instructed verdict; as said in the original opinion: "The facts· supporting this verdict were of record, and so available to.any attorney who might have represented appellees. If the judgment were reversed and the cause remanded, the same judgment would have to be entered on a new trial."

The note for $37,046.35, described in the original opinion, was not for "retained percentage," but was executed in renewal and extension of eleven notes of the water district given to Ballenger upon the estimates of the engineer, and were part of the 85 per cent. to be paid by notes.

The motion for rehearing is overruled.

COMBS, Justice (dissenting).

The writer believes this judgment ought to be reversed and remanded for the reason that it was obtained by the aid of counsel who by the most elemental principles of legal ethics was denied the right to participate. The majority agree that Mr. Seabury was disqualified and that the trial court erred in overruling appellants' motion to·disqualify. They have held, however, that on the facts appearing of record, and independently of any special knowledge that Mr. Seabury may have gained while representing Mr. Barreda, the Barreda Corporation, and the irrigation district, appellees were entitled to an instructed verdict, and so the same judgment would have to be entered upon a new trial.

I cannot concur in that conclusion for two reasons. In the first place, I think appellants should be allowed to go to the jury on the issues of fraud and illegality affecting the $37,046.35 note, and the trustee's sale made by virtue of the mortgage securing it. It will be noted that the majority hold Mr. Barreda barred from urging said defenses because the deed of trust securing the note was foreclosed by a trustee's sale, and that under the rule announced in Hall v. Edwards, Tex.Com. App., 222 S.W. 167, the invalidity of the original indebtedness cannot be inquired into in the present suit. As I view the facts of this case, and as reflected by the findings of the majority, the Edwards Case should not be given application. In giving it application it seems to me the majority overlook the important fact that at the time Mr. Barreda gave the $37,046.35 note to appellee Ballenger, Mr. Seabury was Barreda's attorney, and had been for many years. It was upon Mr. Seabury's advice that Barreda indorsed the note for the "retained percentage" of Ballenger and gave the deed of trust on properties worth $240,000 as security. Mr. Seabury prepared the papers and even executed the papers as an officer of the Barreda Corporation. He then, for some reason, ceased to represent Mr. Barreda, the Barreda Corporation, and the irrigation district, and accepted employment from Ballenger, payee of the note and holder of the lien. As such attorney for Ballenger he advised and acted as legal counsel at the trustee's sale, at which $240,000 worth of his former client's property was bought in by Ballenger for a little more than $40,000. Mr. Seabury was, of course, familiar with all of the transactions which Mr. Barreda contends were illegal and fraudulent, for he had participated in them and directed them at the time they were committed. With that knowledge he advised Ballenger in and directed the form of foreclosure by trustee's sale, which the majority have held had the effect, under the Edwards Case, of denying to his former client, Barreda, the right to assert those defenses. It is the writer's belief that such conduct on the part of counsel so tainted the trustee's sale that same should not be given the effect of precluding any defenses which Mr. Seabury's former clients, the appellants, may have against the original obligation.

In the second place, even if the writer should be in error in his belief that the defenses of fraud and illegality are available to appellants, still the case ought to be reversed and remanded. To my way of thinking counsel's conduct in this case was such that public policy demands at the hands of the court a holding that a judgment so obtained should not be permitted to stand in a Texas court. Both the courts and the legal profession have a serious responsibility to the public. The maintenance by a free people of a government according to law is grounded primarily upon the faith of the people in the integrity of their judicial tribunals, and their respect for and confidence in the agencies through which the law is administered. An attorney is more than a mere practitioner of the law. He is an officer of the court. And whenever an attorney is guilty of conduct which so seriously breaches the canons of legal ethics that it tends to bring the legal profession into disrepute, he not only injures his brethren of the bar, but injures the public as a whole by tending to weaken public confidence in the integrity of the legal institutions by which they are governed. It is one of the glories of the legal profession that citizens of this country universally have from time immemorial freely counseled with attorneys of their selection and submitted to them without fear or restraint the most delicate and important private matters with the assurance that the confidence so reposed would be held inviolate. Rare has been the occasion when such confidence has been breached by an attorney to the extent that a former client would be compelled to face him in the courtroom in the conduct of litigation for an adversary which had its origin under the counsel and direction of that same attorney. The very scarcity of precedents in the published opinions of the courts of this country testifies eloquently to the fidelity with which the thousands of lawyers throughout the nation, past and present, have kept the faith of their clients. In the case before us I conceive it to be the duty of the court to reverse and remand this case if for no other reason than to bar from the counsel table in the trial of it counsel who by the most fundamental rules of legal ethics all members of this court agree should not participate. It should not be deemed essential that the appellants here labor under the burden of showing that some positive injury came to them in the rendition of this particular judgment by reason of the participation of

their former attorney. To so hold is to completely ignore the public policy feature here presented. For to permit the judgment to stand, as the majority have done, will not only permit counsel to reap all the benefits, fees, and emoluments of his representation of the appellees, but what is far more serious, will tend to create the impression that our courts are either powerless or are too deferential in their consideration of an individual member of the bar to perform the unpleasant but vitally important duty of serving as a bulwark against a breach of the canons of legal ethics.